MERCHANTS WAREHOUSE CO. *v.* UNITED STATES ET AL.

MERCHANTS WAREHOUSE CO. ET AL. *v.* SAME.

UNITED STATES ET AL. *v.* MERCHANTS WAREHOUSE CO. ET AL.

PENNSYLVANIA WAREHOUSING & SAFE DEPOSIT CO. *v.* UNITED STATES ET AL.

PENNSYLVANIA WAREHOUSING & SAFE DEPOSIT CO. ET AL. *v.* SAME.

UNITED STATES ET AL. *v.* PENNSYLVANIA WAREHOUSING & SAFE DEPOSIT CO. ET AL.

PHILADELPHIA WAREHOUSING & COLD STORAGE CO. *v.* UNITED STATES ET AL.

PHILADELPHIA WAREHOUSING & COLD STORAGE CO. ET AL. *v.* SAME.

UNITED STATES ET AL. *v.* PHILADELPHIA WAREHOUSING & COLD STORAGE CO. ET AL.

Nos. 635–643. Argued April 21, 1931.—Decided May 18, 1931.

502

503

*Mr. John W. Davis,* with whom *Messrs. H. Edgar Barnes, Allen S. Olmsted, 2d,* and *M. Hampton Todd* were on the briefs, for Merchants Warehouse Co. et al.

*Mr. John P. Connelly* for Philadelphia Warehousing & Cold Storage Co.

*Mr. J. Stanley Payne,* Assistant Chief Counsel, Interstate Commerce Commission, with whom *Solicitor General Thacher, Assistant to the Attorney General O'Brian,* and *Messrs. Elmer B. Collins,* Special Assistant to the Attorney General, and *Daniel W. Knowlton,* Chief Counsel, Interstate Commerce Commission, were on the brief, for the United States et al.

*Mr. John J. Hickey* for Gallagher et al.

Mr. Justice Stone delivered the opinion of the Court.

These are appeals under § 238 of the Judicial Code, from a decree of a District Court of three judges for Eastern Pennsylvania, dismissing the bills of complaint by which appellants, warehousing corporations doing business in Philadelphia, sought to set aside an order of the Interstate Commerce Commission. 44 F. (2d) 379. The order required the Reading Company and the Pennsylvania and Baltimore & Ohio railroads, interstate rail carriers, to cancel such provisions in their tariffs as pur-

ported to make the warehouses of appellants in Philadelphia a part of the station facilities of the carriers, and directed that they cease and desist from making allowances to appellants in connection with the loading and unloading of package freight at the latter's warehouses. There are also cross-appeals from an order of the District Court staying the order of the Commission pending disposition of the appeals in this Court.

The three railroads load and unload package freight at their stations in Philadelphia. The Pennsylvania and Baltimore & Ohio railroads have designated some of appellants' warehouses as parts of their station facilities there. All three have contracts of long standing with one or more appellants, under which the latter, at their warehouses, afford facilities and perform services, in connection with the loading and unloading of package freight, which they denominate terminal facilities and services, and for which the railroads pay them a stipulated compensation. In the case of the Pennsylvania, provision is made for this allowance in its published tariff.

Six warehouse companies, appellees, which also maintain warehouses in Philadelphia with private railroad sidings connected with one or another of the three railroads, and are competitors of appellants, instituted proceedings before the Interstate Commerce Commission, in which they assailed the terminal service contracts referred to as unjustly discriminatory and unduly preferential, and the payments made under them as unlawful rebates. Numerous merchants' organizations of Philadelphia intervened in the proceedings, which were consolidated and heard as a single cause, and resulted in the order before us. 160 I. C. C. 563.

The Interstate Commerce Commission and the court below found the facts as already stated and also the following: Carload freight, carried at carload rates, is customarily loaded and unloaded by the owner or consignee, as required by Rule 27 of the Consolidated Freight Classi-

fication, filed under § 6 of the Interstate Commerce Act, with the binding force of a tariff schedule. By exceptions to the classification, the railroads undertake, as a part of the transportation service covered by their tariffs, to load and unload carload package freight at their Philadelphia freight stations, except when handled directly to or from cars on team tracks. At their warehouses appellants load and unload cars and perform other services presently to be referred to, for which the railroads compensate them by the challenged allowances. These services do not differ in substance from those which the competing warehouses render. Both handle the same classes of freight and procure its shipment to or from them by advertising in trade publications and in circulars to prospective customers. Shippers using public warehouse facilities generally select the company offering the lowest aggregate charge for the distribution of their goods, and, by reason of the allowances made, the contract warehouses are able to quote lower prices than their competitors, thus securing business which would otherwise go to the latter. The primary motive for the payment of the allowances to the contract warehouses is to gain traffic, and the allowances are compensation to appellants for their solicitation of freight movements over the lines of the carriers.

The Commission and court also found as follows: Appellants' warehouses, while nominally open to the general public as railroad freight stations, are not in fact public stations, but are confined to the warehousing of merchandise for their patrons. The services which they perform in connection with loading and unloading of freight, including the sending of arrival notices to their patrons after receipt of notice of arrival from the railroad, the collection of freight charges, and other incidental matters, are in fact performed for the owners of the merchandise rather than for the railroads. While the contract warehouses are not owners of goods received or shipped, the dealings of the railroads are with them and

not with the owners of the goods; and as to many of the inbound carload shipments, the contract warehouses are the only parties to whom delivery of the goods could be made as carload shipments, the real owners being concerns which ship carload merchandise to appellants for distribution by them in less than carload lots. The contract warehouses, being given dominion over the merchandise for transportation purposes, are to be deemed consignors of shipments from, and consignees of shipments to, their warehouses.

Appellants do not seriously contend that the challenged allowances are not discriminatory in fact, but maintain that the discrimination is one which the law permits. While conceding that the contract warehouses and their patrons, by virtue of the contracts and allowances, gain important business advantages over their competitors, they insist that the advantages are those which flow exclusively from the fact that the contract warehousemen are agents of the carriers in the performance of transportation services, and that since the railroads may properly perform such services at their own stations and include charges for them in their filed tariffs, they may likewise select the warehouses of appellants as stations, perform the services there, and employ and compensate the warehousemen for doing them. As these contentions do not comport with the findings of the Commission and the court below that the contract warehouses are not in fact open public freight stations, and that the services rendered are not transportation services, those findings are sharply challenged as without support in the evidence.

We may assume that the railroads, in order to carry on their business as interstate carriers, are not bound to maintain their own freight stations, but may contract with others to supply them and to perform there the transportation services which they are under a duty to perform. *Arbuckle Case* (*United States* v. *Baltimore & Ohio R. Co.*), 231 U. S. 274. If appellants' warehouses were held out to the public by the carriers, and used

exclusively, as freight stations, and the services rendered there were exclusively transportation services which the carriers were either bound or permitted to render, the case would lack those elements which appellees urge as challenging the right of the carriers to make the allowances to appellants. They say that the warehouses of appellants are devoted to their private business activities in the storage, distribution and assembling of freight for their patrons before or after its rail transportation, and that the alleged transportation services are but a part of these activities, not differing from those performed by other warehouses for their patrons as a part of their warehousing business. Appellees contend that the designation of them as transportation services, only when performed at warehouses of appellants, enables the carriers to discriminate in favor of appellants, at the expense of their competitors, by compensating for them in that guise, or, what is the same thing, by extending to appellants at their warehouses the benefit of transportation services withheld from their competitors.

We think, as the court below held, that the Commission's finding that appellants' warehouses are not in fact public freight stations, is supported by the evidence. As already indicated, they are owned or controlled by appellants and used by them, as storage and distribution warehouses located on private premises, served by private side tracks. They are not leased to the railroads. There is no provision in the contracts between the carriers and the warehousemen which suggests that the warehouses were regarded or intended to be treated by either as freight stations. There was evidence that apart from the designation of the warehouses as stations in the tariffs, they were neither held out nor treated as such by carriers or appellants, nor known as such generally to shippers or to representative trucking companies engaged in the business of handling freight in Philadelphia. Pamphlet instructions by the railroads to their employees list their

public freight stations in Philadelphia, but list appellants' warehouses as private industries served by private side tracks. None of the appellants acted as freight agents for the carriers or issued bills of lading. While there was evidence of shipment from appellant's warehouses of freight delivered to them by truck or previously stored there, it did not appear that any shipments were made except for those who were patrons of the warehouses. There were instances where freight brought by truck to contract warehouses and tendered by non-patrons for shipment over the road serving them were rejected on the sole ground that the warehouses were not freight stations, and the intending shippers were instructed by those in charge to tender the shipment at a "freight station" of the carrier.

This and other evidence, which it is unnecessary to review at length, support the conclusion of the Commission that appellants' warehouses are not in fact public freight stations, that the services performed there by appellants do not differ from those performed by their competitors; and that their designation as freight stations was nominal only, the real purpose being the compensation of appellants for soliciting freight shipments over the lines of the carriers. See *O'Keefe* v. *United States,* 240 U. S. 294, 303. This evidence distinguishes the present case from the *Arbuckle Case, supra,* on which appellants rely; cf. *Terminal Warehouse Co.* v. *United States,* 31 Fed. (2d) 951. The credibility of witnesses and weight of evidence are for the Commission and not for the courts, and its findings will not be reviewed here if supported by evidence. See *Interstate Commerce Comm.* v. *Louisville & Nashville R. Co.,* 227 U. S. 88, 92, 100; *United States* v. *Louisville & Nashville R. Co.,* 235 U. S. 314, 320; *Assigned Car Cases,* 274 U. S. 564, 580, 581.

Even though appellants' warehouses are not public freight stations, the questions remain whether the services

for which the allowances are made are transportation services for which the carriers may lawfully compensate, and if they are, whether the carriers may discriminate by granting such compensation to appellants and not to others. Under the contracts those services begin with the receipt for shipment of outgoing freight (the contract with the Reading Company applies only to inbound freight) and with the unloading of the cars of inbound freight. They end with loading for shipment of outgoing freight and, in the case of inbound freight, with the expiration of the forty-eight hour period of free time during which the carrier allows freight to remain at its freight stations, without charge, before delivery to the consignee, or with the delivery, during the period, of the freight on the truck platform of the warehouse. From the expiration of that period, freight not delivered is held by appellants either under such warehousing agreements as they may make with owners or consignees or, in the absence of such agreements, as undelivered freight stored with them by the carriers for the account of the owners.

During this period, they perform three important items of service, not to mention minor ones which, for present purposes, may be disregarded, but for all of which together the allowances are made. They load and unload cars; they may store the freight or some of it; and, what is of vital importance, so far as the present issues of discrimination and rebating are concerned, they may assemble package freight of less than carload lots and ship it in carloads at carload rates, and distribute or reship, in less than carload lots, a large amount of package freight, carried in carloads at carload rates.

Addressing ourselves first to the nature of this third item of service, we note that the rates of the three railroads for transportation of freight in carloads are substantially lower than for package freight in less than car-

load lots. By Rule 23 of the Consolidated Freight Classification, the carriers may not distribute carloads of freight in less than carload lots, nor assemble smaller lots into carloads. By Rule 14, the carriers confine their service with respect to carload shipments to one consignor and one consignee. The service rendered by appellants' warehouses in distributing and assembling package carload freight is thus one which a carrier is not authorized or permitted to render, even at its own public freight stations, and if performed by it would nullify its published rates for carload transportation service. See *New York, N. H. & H. R. Co.* v. *Interstate Commerce Comm.*, 200 U. S. 361.

But it is a service which inures to the benefit of shippers by securing delivery to them or their customers in less than carload lots of package freight which is transported at carload rates. When rendered, as it largely is, within the forty-eight hours free time, that benefit is without expense to appellants or their patrons since it is included in the service for which the carriers pay. A substantial part of the inbound freight, varying from 35% to 80% at the different contract warehouses, is delivered or shipped from them within the forty-eight hours free time. The amount of the allowances paid during the four years preceding the hearing aggregated more than $809,-000; and the conclusion is inescapable that a very large part of the total is for the service of breaking up and distributing carloads in less than carload lots, which the carriers could not lawfully perform at their own public freight stations. Examination of the evidence can leave no doubt that it is the performance of this service, free of charge, to shippers, featured in appellants' advertising and solicitation of patronage, which induces the consignment of freight by shippers to them over the lines of the carriers and withdraws the business from competing warehouses. Such allowances are forbidden, even though

paid to appellants and their competitors alike, since, as to both, they would be departures from carload rates of the published tariffs of the carriers and amount to rebates forbidden by §§ 2 and 3 of the Interstate Commerce Act. See *Lehigh Valley R. Co.* v. *United States*, 243 U. S. 444, 446; *United States* v. *Union Stock Yard Co.*, 226 U. S. 286, 307.

Apart from this consideration, the practical effect of the arrangement with appellants is that the carriers extend, in the form of money allowances to the favored warehousemen, forty-eight hours free time, during which carload freight is unloaded at their places of business, stored, and distributed in less than carload lots, all at the expense of the carriers—a privilege which they withhold from other competing warehousemen and from shippers who maintain their own private warehouses on industrial tracks or private sidings. Granted that the carriers might lawfully undertake to perform or pay for some of these services at warehouses served by private side tracks, they may not extend the privilege to some and withhold it from others. Section 2 forbids the carrier to discriminate by way of allowances for transportation services given to one, in connection with the delivery of freight at his place of business, which it denies to another in like situation. *Union Pacific R. Co.* v. *Updike Grain Co.*, 222 U. S. 215, 220. Appellants rely on *Interstate Commerce Comm.* v. *Diffenbaugh*, 222 U. S. 42, but it is distinguishable from both the present and the *Updike* case in that it did not involve discrimination among shippers or consignees, which was condemned in the latter.

Where a forbidden discrimination is made, the mere fact that it has been long continued and that the machinery for making it is in tariff form, cannot clothe it with immunity. See *Louisville & Nashville R. Co.* v. *Interstate Commerce Comm.*, 282 U. S 740. In that case we held that a carrier may not haul private cars of some of

its passengers free of charge and deny the privilege to others on the theory that it is using the cars which it carries free, as instrumentalities of transportation. The very selection of the cars of some passengers and not others for the favored treatment was held to be a forbidden discrimination. The order of the Commission upheld there would be futile if discrimination could still be effected by filing an exception to the carrier's tariffs for hauling private cars, designating some private cars as transportation facilities, and then granting allowances to the owners for their use. That, in substance and practical operation, is the effect of the tariff exceptions and the allowances which the present order forbids.

Only a word need be said of the objection that appellants and their competitors are not shippers and that the relationship between them and the carriers is not one subject to control by the Commission. The warehouse companies are " persons " authorized to lodge a complaint with the Commission by § 13 (1) of the Interstate Commerce Act, and they are " persons " within the meaning of that word as used in §§ 2 and 3 of the Act. The relationship between persons and rail carriers, with which the Commission is authorized to deal, is not formal, and is not to be determined exclusively by reference to bills of lading. In point of substance the warehousemen were consignors and consignees of merchandise, and they alone could act as such in the case of carload shipments which they assembled or distributed. In this respect they do not differ from freight forwarders who render a like service, so far as concerns their relations with the carriers. *Lehigh Valley R. Co.* v. *United States, supra;* see *Interstate Commerce Comm.* v. *Delaware, L. & W. R. Co.*, 220 U. S. 235; *Great Northern Ry. Co.* v. *O'Connor*, 232 U. S. 508. The evil of discrimination was the principal thing aimed at by the Act, see *Louisville & Nashville R. Co.* v. *United States, supra,* p. 749, and its language is certainly broad

enough to embrace all discriminations of the sort described which it was within the power of Congress to condemn. *Shreveport Case,* 234 U. S. 342, 356. Section 3 makes it unlawful for any rail carrier " to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever. . . ."

For reasons already indicated, the case is not one in which, as appellants argue, the carriers should be left free to remove the discrimination by extending the benefit of the allowances to the competing warehouses. Since the allowances are for services which include the assembling and distribution of carloads from or into less than carload lots, the objections to them would not be removed by extending them to some additional shippers of carloads at carload rates, but not to all, nor even to all under existing tariffs and classifications for the handling of carloads. As the Commission found that appellants' warehouses are not public freight stations in fact but are such in name only, it rightly secured the discontinuance of the discrimination by ordering the carriers to cease employing the means by which it had been accomplished. *New York, N. H. & H. R. Co.* v. *Interstate Commerce Comm., supra,* p. 404. But nothing said here is to be taken as indicating that a carrier may not designate a warehouse as a public freight station and select an agent for its management where a forbidden discrimination is not effected.

The court below was within the limits of its discretionary power in staying the Commission's order pending the appeal. The practice complained of was of long standing, entered into, so far as appears, in good faith, at a time when the discrimination, if it existed, was much less serious than at present, and before the present prohibitions against such discriminations. Its legality now

514

is not free from doubt, as is indicated by the fact that the judges of the court below were not unanimous. The immediate enforcement of the order if the judgment below were not affirmed here would have resulted in a serious and unnecessary disturbance of a course of business affecting not alone the parties to this litigation, but the patrons of the various warehouses, which the court below found would be irreparable. These considerations, taken together, were sufficient to call for the exercise of its discretion. Cf. *Virginian Ry. Co.* v. *United States,* 272 U. S. 658, 672.

*Affirmed.*

MR. JUSTICE ROBERTS took no part in the consideration or decision of this case.