**BAILEY v. PENNSYLVANIA R. CO. et al.**

**TERMINAL WAREHOUSE CO. v. SAME.**

**Nos. 16772, 16774.**

District Court, E. D. Pennsylvania.

Nov. 2, 1932.

White, Schnader, Maris & Clapp, of Philadelphia, Pa. (Thomas Raeburn White, of Philadelphia, Pa., and J. J. Hickey, of Washington, D. C., of counsel), for plaintiff.

Barnes, Biddle & Myers, of Philadelphia, Pa. (John Hampton Barnes, of Philadelphia, Pa., of counsel), for defendant Pennsylvania R. Co.

M. Hampton Todd, of Philadelphia, Pa., for defendant Merchants Warehouse Co.

DICKINSON, District Judge.

There are two of these cases, alike in the questions of law raised. The plaintiffs together seek to recover the rather tidy sum of $6,000,000. If the cases are tried, it will be at the cost of much time, labor, and expense. The questions of law raised go to the cause of action asserted, and hence "to the whole of the claim" made. Counsel in consequence join in the expression of the hope that it may be found that the fact and law merits of the cause may be brought before the court by the pleadings, so that the judgment to be rendered may be reached without the necessity of a protracted trial.

The parties are represented by experienced counsel, who have made an exhaustive investigation and present a complete analysis of the respective contentions made. We accordingly, knowing the opposing interests to be in competent hands, feel that we can safely follow the analysis thus made, and accept the questions discussed as the questions which arise in the case.

In order to get the point of view of the defendants, it is helpful to premise that the railroad defendant is a common carrier en-

gaged in interstate and intrastate commerce. Philadelphia is a city on its line. There is an advantage to consignors and consignees in availing themselves of the lower tariff rates given to shippers in carload lots, and hence the practice grew up for those who would otherwise be consignees of less than carload lots to join together in getting a car-load shipment. This made it necessary, or at least convenient, for them to choose one consignee to whom, or in whose care, the carload shipments could be made, and helpful further to have this consignee distribute the contents of the cars to the several real owners. There was the like necessity or advantage in making shipments. The shipments to and from Philadelphia were some to points within the state and some to points outside. There was need that this representative receiver and sender of shipments should be trained and equipped for the service he was to render. In response to this need and consequent demand, what are called warehousemen came into existence. The appellation is itself descriptive of the work they did. The plaintiff is one such warehouseman and the codefendant is another. The further practice years ago grew up for the different railroads each to select a warehouseman to render the service indicated. For it the warehouseman chosen was compensated by the railroad, and substantial sums of money were received by the codefendant for the services thus rendered by it. The codefendant was made, or made to figure as, an employee of the railroad, and its warehouse was made or called a freight station of the railroad. Incidentally, for whatever it may be worth, the averment is made that the railroad was part owner of the codefendant warehouse and received a share in its profits, and the suspicion would be justified that the officials of the railroad likewise profited by the arrangement made, for this, in former years, was the common practice. However, at the time this was done and for years afterwards, there was not thought to be, and there was not, any illegality in it. What was done was openly done and avowed, and was made the subject of a written agreement. When it is recalled that the plaintiff and the codefendant, as well as others, were competitors in the same field of business endeavor, it would be idle to deny that the arrangement thus made greatly favored the chosen warehouseman and put its competitors to a great disadvantage. Whatever wrongs the outsider warehousemen felt, there was no legal wrong done them, and they were obliged to submit and accept the situation as thus created. Then came the act of Congress creating the Interstate Commerce Commission, to which the complaining warehousemen finally went with their complaint. The Commission, after a full and lengthy inquiry, ruled in favor of the complainants, and the defendants (the codefendant here having been permitted to intervene) were ordered to desist from the practice above outlined. Gallagher v. Pennsylvania R. Co., 160 I. C. C. 563.

The defendants brought this order before the statutory court, which was convened for the purpose, for review, and the Commission was by that court sustained and upheld in what it has done. Merchants' Warehouse Co. v. U. S. (D. C.) 44 F.(2d) 379.

On appeal to the Supreme Court the rulings made by the Commission and by the statutory court were affirmed. 283 U. S. 501, 51 S. Ct. 505, 75 L. Ed. 1227.

This recital will enable us to appreciate the questions of law raised by this statutory demurrer. They are:

(1) The remedy to which the plaintiff has a right is that afforded by the Interstate Commerce Act (49 USCA § 1 et seq.). This is exclusive and has been exhausted by the plaintiff, hence no right of action is given by the Sherman Anti-Trust Act (15 USCA §§ 1–7, 15 note) under which the plaintiff is now claiming, nor does any cause of action arise thereunder.

(2) The business charged to have been in part monopolized and restrained is not commerce within the meaning of the commerce clause of the Constitution, nor is it interstate.

(3) The railroad defendant and the warehouse defendant are not competitors nor have they competed, so that no agreement nor arrangement between them could nor did restrict competition.

(4) Interstate commerce is not directly affected by the agreement between the railroad defendant and the warehouse defendant nor by anything done thereunder, and in consequence no cause of action arises under the Sherman Act.

### Discussion.

■■ In discussing these questions, we shall depart from the order in which listed, and to some of them give only a more or less perfunctory consideration. It is unnecessary to premise that we are dealing, not with trial questions, but with questions of pleading; with what is averred, not with the truth of the averments. The statement of claim avers (1) that the plaintiff is engaged in commerce, and (2) that this commerce is in part interstate,

but these general averments are qualified by statements of what the plaintiff does, for it likewise avers what it is in which the plaintiff is engaged, and hence the questions do arise (1) whether this is commerce, and (2) whether it is interstate. What the plaintiff did was to receive interstate shipments carried by the railroad, either consigned to him or in his care, for the patrons of his warehouse, and to receive from the latter shipments to be made in interstate commerce. It is true he did not have title to the shipment, but the commercial character of the shipment does not turn upon the ownership of what was shipped. Commerce is business intercourse. If it takes the form of transportation, its commercial character is independent of what is shipped or who owns it. Gibbons v. Ogden, 22 U. S. (9 Wheat.) 1, 6 L. Ed. 23.

We are of opinion that the plaintiff was engaged in commerce and in interstate commerce. We see a well-defined difference between the Commerce Act and the Sherman Act. They have different objectives. The former is aimed at control of the carriers to the end that they may not exact excessive rate charges; the latter is aimed at those who would restrain or monopolize commerce. It is true that the forbidden thing in the former may, and we assume always would, tend to interrupt or diminish the flow of commerce, although it is conceivable that it might not. The forbidden thing in the latter is the restraint or monopoly of commerce. It might well be that the trade of A could be destroyed through a conspiracy which used as one of its instrumentalities the imposition of killing tariff transportation rates upon B. The distinction between the two injuries is no less real if A and B were the same person. If they were, we see no legal obstacle in either act to A appealing to the Commission to stop the illegal exaction under the one act and to appeal to the courts to award him damages under the other. In moving to this conclusion, we do not encounter Keogh v. Chicago & N. W. R. Co., 260 U. S. 156, 43 S. Ct. 47, 67 L. Ed. 183.

In that case the question was not of commerce but of rates. The charge was that a number of carriers had conspired to exact undue tariff rates. An appeal was made to the Commission, with the result that the rates were held to be reasonable and lawful. An appeal was then made to the courts under the Sherman Act, but there was no complaint other than a conspiracy to exact an excessive tariff charge. It was held that the plaintiff had no cause of action and that the Sherman Act gave no right of action; the sole remedy for an excessive tariff rate injury being given by the Commerce Act.

Here the injury complained of is not the exaction of an undue transportation rate but an injury to plaintiff's trade. The charge has no reference to the tariff rate other than that this was used as one of the instrumentalities by which injury to trade was done.

The argument addressed to us assumes the plaintiff to have no complaint (as in the Keogh Case) except of an excessive tariff charge. This is not only not the only complaint but it is not the complaint at all.

The conclusion reached is that the plaintiff may resort to the Sherman Act for redress of the injury to his trade.

■ The further point made that the carrier and its favored warehouseman are not competitors is a fact, but we cannot accept the application made of it beyond its possible trial use to acquit the carrier of participation in a conspiracy to monopolize a trade in which it had no interest. The plaintiff and the warehouse defendant are, however, competitors, and, if the carrier, although without interest, joined in the conspiracy charged, it would be answerable. Moreover, the further complaint is that it is interested.

The remaining points made we find no need to pass upon at this time. It may or may not be true that the contracts do not in themselves "constitute a restraint or monopoly of the warehousing business." The charge, as several times said, is the wholly different one of a conspiracy to monopolize with the contracts averred to be among the means used to achieve the plotted result. What the fact may be is a trial question. So likewise the defensive proposition, that the plaintiff having appealed to the Commission has lost his right of appeal to the courts. The answer is a reiteration. The basis of the action is a conspiracy to give one of the defendants a monopoly of the warehousing business to aid in accomplishing which the other defendant made unlawful use of its rate making powers. This unlawful use was stopped by the Commission, but it does not follow that the plaintiff is thereby shut out from seeking the remedy given by the Sherman Act.

We are of opinion that the questions of law raised should be ruled in favor of the plaintiff, with leave to defendants to file an affidavit of defense to the fact averments of the statement of claim, in accordance with the

Pennsylvania Practice Act of 1915 (12 PS Pa. § 382 et seq.).

An appropriate order may be submitted, and a like order entered, in No. 16774, March sessions, 1932.