**BALTIMORE & O. R. CO. et al. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al., Interveners).\***

District Court, S. D. New York.
Aug. 25, 1937.

274

Thomas P. Healy and Carleton W. Meyer, both of New York City, for plaintiff Baltimore & O. R. Co.

Edwin H. Burgess, of New York City, (Charles R. Webber, of Baltimore, Md., Alex H. Elder, Walter. J. Larrabee, M. B. Pierce, Thomas P. Healy and Carleton W. Meyer, all of New York City, and Guernsey Orcutt, of Chicago, Ill., of counsel), for all plaintiffs.

Alex H. Elder and Richard J. Lally, both of New York City, for Central R. Co.

A. Lane Cricher, of Washington, D. C. (Orrin G. Judd, of New York City, of counsel), for American Warehousemen's Ass'n Merchandise Div.

Henry E. Foley, of Boston, Mass. (Searle, James & Tyng, of New York City, of counsel), for interveners.

John J. Hickey, of Washington, D. C., for intervener Warehousemen's Protective Committee.

Elmer B. Collins, Sp. Asst. to Atty. Gen., J. Stanley Payne, Asst. Chief Counsel, Interstate Commerce Commission, of Washington, D. C., Robert H. Jackson, Asst. Atty. Gen., and Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission, of Washington, D. C., for the United States.

Before CHASE, Circuit Judge, and PATTERSON and HULBERT, District Judges.

CHASE, Circuit Judge.

This suit was brought by seven common carriers in interstate commerce under the provisions of the Urgent Deficiencies Act and heard by a court of three judges con-

stituted as the law requires. 38 Stat. 219; 28 U.S.C.A. §§ 41 (28) and 43–48, inc.

The plaintiffs are the Baltimore & Ohio Railroad Company; the Central Railroad of New Jersey; the Delaware, Lackawanna & Western Railroad Company; Erie Railroad Company; the New York Central Railroad Company; and the Pennsylvania Railroad Company. All of them transport freight by rail to and from the Port of New York District in interstate or foreign commerce or both. They all provide warehouse space and services for such freight both of the kind shown as in-transit and that classed as commercial; the latter kind being what is not essential to actual transportation of the goods. The plaintiffs are competitors among themselves for both the eastbound and westbound New York traffic and also with private corporations owning and operating warehouses in the New York District for that part of the business which is done by warehousemen.

The Interstate Commerce Commission undertook, on July 6, 1931, an investigation on its own motion in a proceeding entitled, "Practices of Carriers Affecting Operating Revenues and Expenses," in which all common carriers by rail subject to the Interstate Commerce Act (49 U.S.C.A. § 1 et seq.) were made parties, to determine whether those carriers were being operated economically and efficiently within the provisions of sections 12 and 15a of the act (49 U.S.C.A. §§ 12, 15a). Thereafter, its attention was especially directed by complaints of warehousemen in the Port of New York District to the warehouse practices of the plaintiffs in that district and on January 6, 1932, it began an investigation, known as ex parte 104, in connection with its general proceeding above mentioned for the purpose of " * * * establishing facts concerning all policies, practices, services and charges in connection with warehousing and/or storage of freight by carriers serving the Port of New York District. * * *"

The object of this suit is to enjoin and set aside an order entered on February 2, 1937, by the Interstate Commerce Commission in subdivision ex parte 104 of the original proceeding requiring the plaintiffs to cease and desist before a future date fixed (and later extended so that it has not as yet become effective) from certain practices of which we are concerned only with that part which prohibits all the plaintiffs (except the Central Railroad of New Jersey as to furnishing insurance) from permitting shippers in interstate commerce over their lines from using space by lease or otherwise in warehouses, buildings, or piers of the plaintiffs at rates and charges which do not compensate the plaintiffs for the cost of providing such space; from storing goods shipped over their lines in interstate commerce or providing commercial storage for shipping at less than cost; from directly or indirectly handling goods for shippers at such warehouses, buildings, or piers at rates and charges which fail to compensate them for the cost of such handling; from insuring such goods for shippers at less than cost; and from " * * * applying, by means of tariffs now on file with this Commission * * * noncompensatory rates and charges * * * for the leasing of space, storage, handling and insurance of goods shipped over their lines in interstate commerce which goods are stored, handled or insured in connection with commercial warehousing service." The Central Railroad of New Jersey also seeks to enjoin and set aside that part of the order prohibiting it from "subsidizing and granting concessions to the Newark Central Warehouse Company by means of noncompensatory rentals collected or received for the space leased by the Newark Central Warehouse Company from said * * * carrier."

Before the order was made, the Interstate Commerce Commission had conducted hearings at length at which all parties were given the opportunity to present evidence and be heard. The Warehousemen's Protective Committee, an organization representing the independent warehouses in the district, was allowed to intervene and take part. The City of Boston, the Boston Port Authority, and the American Warehousemen's Association, Merchandise Division, have become interveners in this suit. The commission filed its first report on December 12, 1933, wherein it admonished the plaintiffs to change the practices it disapproved but made no order. On June 8, 1936, it filed a second report; and on February 2, 1937, a third report, which reaffirmed the others in so far as is now important, and made the order herein resisted. The order attacked is, accordingly, based upon the findings in all three reports.

In view of the restricted nature of the issues presented, it will not be necessary to state at length the substance of these re-

ports to which reference, however, is made. It is sufficient presently to know that upon adequate evidence the commission has found that the plaintiffs now do at less than cost all those things which the order prohibits them from doing at noncompensatory rates and charges. There is no finding that they do not conform to their published tariffs in so far as such tariffs cover the services provided, but the indirect violation of section 6 of the Interstate Commerce Act (49 U.S.C.A. § 6) by the forbidden practices has been found in that those permitted to receive such below cost services in effect move their goods at less than tariff rates and receive preferential treatment in violation of section 3 (49 U.S.C.A. § 3), while others not so favored are discriminated against in violation of section 2 (49 U.S.C.A. § 2).

The common complaint of all the plaintiffs is that the order was made after the denial of their motion to reopen the proceedings for the purpose of introducing evidence to show that the condemned services were provided at charges equivalent to their fair and reasonable value; that there are no findings sufficient to support it in that the commission did, not find that what the plaintiffs provided for shippers at less than cost was provided at less than the fair and reasonable value; and that cost is too vague and indefinite a term to make the order sufficiently definite to enable them to comply.

All this boils down to the one issue of whether or not the findings are sufficient support in law for the order made. If they are, the plaintiffs were not prejudiced by the denial of their motion to reopen the proceedings. It is clear that the order must be based upon findings supported by the evidence, which show it to be within the jurisdiction of the commission as derived from the act. United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023. The power to make the order, therefore, depends upon whether the providing of such services as were found to have been furnished for less than cost violates the act in that some shippers are given more favorable treatment than others in like situation. It is not denied that that result would follow if such services were performed for some shippers only at less than their reasonable worth, but it is insisted that reasonable worth and not cost is the true criterion by which

their practices must be tested in the light of the provisions of the act.

The argument, further developed in discussing later the special complaint of the Central Railroad of New Jersey, is that the plaintiffs have invested in warehouse facilities in the New York District at prices so high that they cannot successfully compete with warehousemen in that territory if they charge enough to return to them the cost of the service since their overhead is necessarily so high. That, of course, depends upon what treatment should be accorded excessive investment under accepted accounting standards in figuring cost. We are not now called upon to go into that subject. Moreover, we find no real substance to the argument that cost is too vague a term upon which to base the order. Cost is certainly as definite as the fair value standard for which the plaintiffs contend and since it can be figured from past actual experience would seem to be much more so. Indeed, it is idle to argue that cost does not admit of such definite calculation that the plaintiffs cannot comply with the order.

In any event, we think the cost basis has been approved by authority which binds us. In New York, N. H. & H. R. Co. v. Interstate Commerce Commission, 200 U.S. 361, 26 S.Ct. 272, 50 L.Ed. 515, the sale and transportation of coal at less than the cost of the coal plus transportation at tariff rates was held to violate sections 2, 3, and 6 of the Interstate Commerce Act. In giving effect to the remedial provisions of the act to prevent discrimination between interstate shippers and the granting of preferences either directly or indirectly, we can find no real distinction between furnishing transportation of goods plus commercial warehousing, or insurance, or both at rates less than those of the published tariff plus the cost of what warehousing and insurance is furnished and the sale of coal to be delivered at a price which did not cover its cost in addition to the tariff rates for transportation. In the present instance, commercial warehousing, storage, and insurance were sold instead of coal, a circumstance creating no difference so far as the principle which controls is concerned.

Though it is true that the published tariffs of the plaintiffs cover what is called in-transit storage and such tariff rates have been charged uniformly, it by no

means follows that sections 2 and 3 (49 U.S.C.A. §§ 2, 3) have not been violated by the practices forbidden by the order. In its second report, the commission said: "The transit privilege permits the stopping of goods at an intermediate point between the point of shipment and final destination, and the reshipment from the intermediate point at the through freight rate lower than the combination of local rates which the shipper would otherwise pay. The privilege is of great importance to many shippers and its commercial necessity has long been recognized. We are not to be understood as condemning bona fide transit arrangements, but only the practice here considered in which the carriers, through stress of competition, have assumed by tariff publication a part of the cost of strictly commercial storage and handling of goods. * * *" And in its third report, the commission said in reference to this subject: "What is here condemned is the fact that the respondents have voluntarily engaged in storage and warehousing services which are not within their common-carrier obligations, and by providing such services to shippers below the cost of such services, reduce the cost to such shippers for the transportation of their goods. The tariffs now on file are instruments which work violations of the act, in that through them respondents hold themselves out to perform commercial services (under the guise of performing transportation services) at rates and charges which fail to compensate respondents for the cost of performing them and thereby violate sections 2, 3 and 6 of the act."

The violations of the act, which were amply proved and which the commission pointed out broadly as the above quotations show, are based upon the voluntary performance, by the carriers for some shippers only in order to get or keep business, of commercial services in connection with transportation services at rates and charges which, when added together, do not return to the carriers the published tariff rates plus the cost of the commercial services. As to what are commercial services, see Merchants' Warehouse Co. v. United States, 283 U.S. 501, 503, 51 S.Ct. 505, 75 L.Ed. 1227. To the extent that such cost is not returned, the tariff rates for the transportation are in effect reduced as much as though a rebate to such shippers to the amount of the carrier's loss had been paid. And this is so whether the voluntary commercial services performed by the carriers to get or hold business in the face of competition are charged at their fair value or not. If the carriers sustain losses in performing voluntary commercial services for shippers as an inducement to them to buy transportation of the carriers at the published tariff rates for the goods as to which such voluntary commercial services are performed, it can make no difference, in the effect of such practices on the tariff rates, that the voluntary commercial services were charged at their fair value if that happens for whatever reason to be less than the cost to the carriers. To the extent that the carriers are out of pocket because of the performance of such voluntary commercial services in connection with transportation furnished a shipper, their published tariff rates for such transportation are cut. We are now dealing with the requirement for the maintenance of the published tariff rates for transportation which the act makes applicable alike to all shippers under like circumstances, and, if the inducing commercial service which the carriers perform for some shippers to get or hold their business has the effect, as has been made to appear by the evidence and has been found by the commission, of cutting those tariff rates because out of such rates a loss must be deducted to get the true net transportation return, the transportation service is furnished by the carriers to those shippers for less than to others whether the loss deduction results from commercial services performed at their fair value or not That is the vice the order is designed to do away with and it will not be cured if the fair-value standard is substituted for the cost standard in respect to commercial services performed to get or hold transportation business. If the cost to the carriers of the inducing commercial services performed is more than the charges for those services, the lessening effect upon the published tariff rates for transportation and the consequent violation of the act allow as surely whether the commercial services are charged at their fair value or not. In other words, fair value is immaterial except on the question of efficiency in connection with the determination of loss. So we agree with the commission that the condemned practices do violate the act and hold the order supported by the findings and generally within the scope of the commission's power.

■ The New York Central Railroad Company was found to have leased space in its warehouses to the Mellish Company and the Auto Storage Company at less than cost for the storage of automobiles. These lessees were found to be shippers in interstate commerce over the New York Central's lines; to be competitors of warehouse companies in the New York District who were also shippers in interstate commerce over that railroad; and it was also found that the railroad paid allowances to those lessees for unloading and handling automobiles which were commercial services. The railroad has especially attacked these findings. In view of what was said as to commercial services and shippers within the meaning of the act in Merchants' Warehouse Co. v. United States, supra, we think the findings were justified by the evidence.

■ The Central Railroad Company of New Jersey, through a wholly-owned subsidiary called the Newark Warehouse Company, built a large warehouse in Newark, N. J., in 1905. The railroad rented part of the building from its subsidiary for station space from 1906 to 1932, and the subsidiary operated the remainder as a warehouse until 1934 by which time it had accumulated a large deficit that had been increased by the termination of the railroad of its lease for station space in 1932. The building, after unsuccessful attempts had been made to sell it, was leased on June 1, 1934, to the Newark Central Warehouse Company, not connected with the railroad or its subsidiaries, at a varying annual rental, based in part upon the earnings of the lessee, with the privilege of renewal after two years. The rental received during the first year was a little less than half the taxes on the building for that year and it is clear that the commission's finding that the lease is noncompensatory is correct. The Newark Central Warehouse Company, as justifiably found by the commission, "engages in a general warehouse business and performs any and all services necessary in conducting that business. In many instances it has dominion for transportation purposes as consignee or consignor * * * over goods shipped in interstate commerce and stored by it. It engages in whatever branch of the general warehousing business it considers profitable, including the handling of cars containing shipments for two or more consignees and occasionally handles the equivalent of pool cars. In some cases the warehouse company pays the freight charges to the railroad and later collects from the owners of the goods." This lessee is a shipper in interstate commerce over the railroad lines in competition with other such shippers and to the extent that it is allowed to use the railroad's warehouse (we treat the building as owned by the railroad as have the parties though the title is in a wholly-owned subsidiary) at the expense of the road for commercial purposes in connection with the transportation services it buys of the road, and the published tariff rates of the railroad are in effect cut to it. This would be plain enough if the railroad let the Central Company so use the warehouse for nothing and an inadequate rental which has the effect of cutting the published tariff rates to the favored lessee shipper is a violation of sections 2, 3, and 6 of the Interstate Commerce Act. Central of Georgia Ry. Co. v. Blount (C.C.A.) 238 F. 292. The prohibition of the order is the leasing at a noncompensatory rental of space which subsidizes and grants concessions to the lessee. The commission drew the conclusion in its second report from sustaining evidence, "* * * that the warehouse is an adjunct of the railroad's traffic department, (and) that the latter has made continuous and intensive efforts to solicit traffic over its line for storage in the warehouse." That it had an incentive to do that not only to increase its traffic but also to increase its net rent under the terms of the lease is plain enough. It is no answer to the violations of the statute to say that as the railroad has a losing piece of property on its hands which it acquired in good faith it should be permitted to rent it for its fair rental value. That is true only provided so doing does not violate the law. While it may lawfully minimize its losses from bad investments, it may not give concessions to a favored shipper which in effect permit the railroad to cut its published tariff rates to that shipper. In this respect, all carriers subject to the provisions of the Interstate Commerce Act must stand and be treated alike whether they have made poor investments or not.

■ In what we have said we have reference, as did the commission, to the necessity for rates and charges and rentals for commercial services which will not reduce in effect the published tariff rates for transportation services including such in-transit handling and storage as are properly in-

cluded in such published tariffs. As such below-cost commercial services are distinguishable from what are properly transportation services, we do not come into conflict with the principle that reasonable tariff rates need not be sufficient to give railroads a fair return on every transportation service rendered in respect to every part of its property so used. See St. Louis & S. F. R. Co. v. Gill, 156 U.S. 649, 667, 15 S.Ct. 484, 491, 39 L.Ed. 567, 573; Atlantic Coast Line R. Co. v. North Carolina Corp. Comm., 206 U.S. 1, 27 S.Ct. 585, 51 L.Ed. 933, 11 Ann.Cas. 398.

█ We, therefore, are of the opinion that the findings of the commission supported by the evidence show that it had the power to make the order in so far as it concerns every plaintiff, and that the order is sufficiently certain and definite in terms to enable the plaintiffs to comply.

Bill dismissed with costs.