**DETROIT & CLEVELAND NAV. CO. et al.
v. UNITED STATES et al.**

No. 4259.

District Court, E. D. Michigan, S. D.

Sept. 29, 1944.

82

Daniel H. Kunkel and Daniel W. Knowlton, both of Washington, D. C., for defendants.

Robert L. Pierce and Wendell Berge, both of Washington, D. C., and John C. Lehr, of Detroit, Mich., for the United States.

Foster, Yost & Lott, of Detroit, Mich., for T. J. McCarthy Steamship Co., and Automotive Trades Steamship Co.

Before SIMONS, Circuit Judge, and TUTTLE and O'BRIEN, District Judges.

SIMONS, Circuit Judge.

The plaintiffs are common carriers of motor vehicles by water upon the Great Lakes, authorized as such by the Interstate Commerce Commission under § 309(a) of the Interstate Commerce Act, 49 U.S.C.A. § 909(a), and were protestants in hearings before the Commission upon the application of the defendant steamship companies, to operate as common carriers of motor vehicles between Detroit, Michigan, and ports on Lake Erie and Lake Superior. The hearings resulted in an order of the Commission granting a certificate of convenience and necessity to the defendants under § 309(c) of the Act, and this order the plaintiffs now seek to enjoin, set aside, and annul. The case was submitted to a court of three judges in pursuance of § 47, Title 28 U.S.C.A., and it is stipulated that the cause is submitted as upon final hearing upon the record made before the Commission.

The court is fully advised in respect to the finality of factual determinations made by the Commission if supported by evidence, Merchants' Warehouse Co. v. United States, 283 U.S. 501, 508, 51 S.Ct. 505, 75 L.Ed. 1227, and understands that "the judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Co. v. United States, 292 U.S. 282, 286, 54 S.Ct. 692, 694, 78 L.Ed. 1260. The court is also aware of the basic purpose of the Transportation Act of 1920, in that "it recognized that preservation of the earning capacity, and conservation of the financial resources, of individual carriers, is a matter of national concern; that the property employed must be permitted to earn a reasonable return; that the building of unnecessary lines involves a waste of resources, and that the burden of this

Angell, Turner, Dyer & Meek, of Detroit, Mich., Pope & Ballard, of Chicago, Ill., and S. S. Eisen, of New York City, for plaintiffs.

waste may fall upon the public; that competition between carriers may result in harm to the public, as well as in benefit * * *." Texas & Pacific R.R. Co. v. Gulf, Colorado & Sante Fe R.R. Co., 270 U.S. 266, 277, 46 S.Ct. 263, 266, 70 L.Ed. 578, also Texas & New Orleans R.R. Co. v. North Side Belt R.R. Co., 276 U.S. 475, 479, 48 S.Ct. 361, 72 L.Ed. 661. The court also assumes that the underlying purpose of the original Act is likewise the purpose of the amendment thereto made by the Act of September 18, 1940, covering water carriers and now incorporated as Part III, Chap. 12 of the Act, 49 U.S.C.A. § 901 et seq.

Section 309(a), being § 909 of Title 49 U.S.C.A., contains the so-called "grandfather clause", providing, in effect, that where an applicant for a certificate of public convenience and necessity was in bona fide operation as a common carrier by water on January 1, 1940, and continued in such operation to the date of the application, the applicant shall be entitled to such certificate as a matter of right. Section 309(c) provides that the Commission may grant such certificate also to any applicant fit, willing, and able to perform the service proposed, if such service will be required by the present or future public convenience and necessity.

Originally the applications of the defendant carriers were for certificates either under the "grandfather clause" of § 309(a) or under § 309(c), and sought authority as common carriers between Detroit and Lake Erie ports. Upon oral argument, however, before a division of the Commission, the applicants indicated that they also desired authority to serve ports on Lake Superior. Their applications under § 309(a) were denied by the division on the ground that the applicants were not in bona fide operation as common or contract carriers by water on January 1, 1940. This finding was affirmed by the Commission. As to the applications under the provisions of § 309(c), the division concluded that the evidence submitted was not sufficient to support a finding that present or future public convenience and necessity required operation by applicants, but upon hearing by the Commission an ultimate finding was made that the operations proposed will be consistent with the public interest and the national transportation policy declared in the Act, and notwithstanding protest that the order sought extended the scope of authority beyond the scope of the application, the certificate authorized included authority to serve Lake Superior ports.

The question of law submitted to the court is that the action of the Commission is not supported by evidence. The plaintiffs, however, rest their case upon the evidentiary findings of the Commission, and submit the proposition that these findings do not support the ultimate finding and conclusion of the Commission as to public convenience and necessity. There is, therefore, no need for the court to give detailed consideration to the record made before the Commission, and we confine ourselves mainly to the facts developed in its report. These disclose that applicants' president, T. J. McCarthy, was affiliated with the D. & C. Company, in a soliciting capacity, for about 9 years prior to 1942; that from 1937 to 1942 two of his vessels were chartered by the D. & C. to transport motor vehicles from Detroit to Lake Erie ports, and a third vessel for the same purpose was chartered during the 1940 and part of the 1941 season. All three vessels were originally bulk carriers, but were later equipped to carry motor vehicles. Because of the cessation of manufacture of motor vehicles for civilian use, all three vessels were reconverted to bulk freighters prior to the 1943 navigation season. The applicants, however, have retained the equipment and parts originally installed, and are prepared to reconvert their vessels into motor vehicle carriers upon termination of the war. Meanwhile, some use had been made of their vessels for carriage of military vehicles to Great Lake ports during 1942, and similar shipments were in prospect for 1943 at the time of the hearing, such vehicles being carried on the spar decks while the vessels were being operated in bulk transportation.

At the time of the final hearing no vessels of the motor vehicle carrying type were in operation on the Great Lakes, and a large percentage of all types of vessels formerly so used had been requisitioned by the government and withdrawn from service on the lakes, although since then the applicants have advised the Commission that the government was returning to the plaintiff Great Lakes Transit Corporation, 4 of the 14 vessels of that carrier which had been requisitioned. The applications were supported by witnesses from

motor manufacturing companies, the substance of whose testimony was that the vessels of the applicants were essential to the transportation of automobiles in the past, that it would not have been possible, without them, for the water carriers to have handled the automobiles offered for transportation in 1940 and 1941, and that these vessels would again be needed when normal production of motor vehicles is resumed. There was also evidence that there had been some delay in the transportation of motor vehicles by water during the 1941 season. During the seasons 1939 to 1941, inclusive, the vessels of the applicants, chartered by the D. & C. Company, handled from 64 to 74 percent of the motor vehicles carried by that company prior to the cessation of their manufacture. The peak period for the movement of automobiles on the Great Lakes during those years commenced in September or early October, with the production of new models. In 1940 and 1941 there were delays ranging from 2 to 4 days in the loading of automobiles from the docks at Detroit, incident to the congestion of such traffic. and because of such delays it was necessary, at times, to move automobiles by motor trucks.

Before the discontinuance of the manufacture of motor vehicles for civilian use, the plaintiff Nicholson operated four vessels specially designed for the purpose of transportation of motor vehicles. Of these, one was converted during 1941 into a combination motor-vehicle and bulk carrier. It also transported automobiles from Detroit to Duluth on the spar decks of its 8 bulk carriers, but its vessels had not been operated to capacity for the transportation of automobiles. It gave evidence that there had been no delay in its shipments, and that its service was satisfactory. At the time of the hearing it operated 9 vessels, 5 of which were owned and operated for the federal government. It had, however, begun negotiations to reacquire these vessels at the end of the war, intending to re-engage in the transportation of motor vehicles when their manufacture is resumed, and to make available adequate transportation for such tonnage as may be offered to it.

The plaintiff Great Lakes Transit Corporation had been engaged in the transportation of passenger and freight on the Great Lakes for more than 25 years; one of its vessels was specially equipped to carry motor vehicles, and it had also transported such vehicles on its combination passenger and freight or package and freight vessels. It expects to resume transportation when vessels again become available, and to provide sufficient vessels to meet the needs of shippers. Since the hearing, four of its vessels have been returned to it. by the government, and it had advised the Commission that these vessels would be in operation before the close of the 1943 season.

Like the other plaintiffs, the D. & C. Company intends, as far as it is capable of doing so, to make its former facilities, or their equivalent, available for motor vehicles at the termination of the war. At the time of the hearing it was operating 5 combination passenger and package freight vessels, the government having requisitioned two others, one a combination passenger and freight vessel and the other an automobile carrier, and the charters on the three automobile carriers owned by McCarthy's companies had been canceled or relinquished.

Upon these evidentiary facts the Commission found that there had been a definite need for the applicants' vessels in the transportation of motor vehicles between Detroit and Lake Erie ports prior to the cessation of the manufacture of motor vehicles for civilian use. It also found that there was reasonable certainty that there would be a like need for them in that service at the termination of the war, or when normal production and shipment by water of motor vehicles for civilian use was resumed. It based this ultimate finding upon the evidence of Detroit automobile manufacturers, that such vessels would be needed in the future, not only in transportation between Detroit and Lake Erie ports, but also between Detroit and Lake Superior ports, and that in the absence of applicants' vessels it would not have been possible for the water carriers to have handled the automobiles offered for transportation in 1940 and 1941, and that with the resumption of manufacture, the use of applicants' vessels would be necessary in the handling of such traffic. It also found that refusal of the applicants' right to initiate operations with their own vessels might seriously impair their investment in such vessels, and while such fact was not controlling, denial of the applications would deprive shippers of necessary transportation facilities, and not

be in the public interest. Moreover, even though the protestants expected that considerable tonnage would be available at the termination of the war, there was much uncertainty as to the length of time that might be required to procure and place in operation on the Great Lakes, additional vessels adapted to their needs; that replacement by the D. & C. of its passenger and freight vessels alone would not adequately meet the needs of the service for the reason that during a substantial part of the navigation season the vessels would again be used for the transportation of passengers and their automobiles, leaving little carrying capacity for other motor vehicles, and this would also be true of some of the vessels of the Great Lakes Transit Corporation. The three vessels of the applicants could be reconverted into motor vehicle carriers without much difficulty, because the necessary materials and equipment for that purpose had been retained, and it was their intention to reconvert upon termination of the emergency. The conclusion was therefore reached that the public interest would be adversely affected if, after production of automobiles is resumed, the protestants were delayed in acquiring additional vessels concededly necessary to meet the expected increase in the demand for transportation.

In respect to the finding of the Commission that the vessels of the applicants were needed to supply the needs of automobile manufacturers for transportation in the period '39 to '41, the plaintiffs point out that this finding can mean no more than that their carrying capacity was required, and not that the specific vessels belonging to the applicants were required. This, the brief on behalf of the government and the Commission appears to concede, in the statement, "The past extensive operations of these boats on Lake Erie, even though by the D. & C. Company, clearly showed that there was a public need for the carrying capacity represented by them". This interpretation of the Commission's finding being established, the point is now made that in the absence of any showing by the applicants that their vessels were the only vessels available to the carriers to meet the transportation requirements of the automobile companies beyond that furnished by their own vessels, and in the absence of a showing that the future needs of the automobile companies for such carrying capacity can be met only by the vessels of the applicants, there is no evidence to sustain the Commission's ultimate finding that the public's convenience and necessity requires a grant to the applicants of common carrier rights. To put it more plainly, they say there is a gap in the evidence not bridged by any other evidentiary finding which necessitates a conclusion that the Commission's determination is unsupported. With this we are compelled to agree. Not only is there no finding to the effect that if the D. & C. had not chartered the vessels of the applicants there was no other carrying capacity it could have acquired, but the record to which we are cited establishes the contrary.

When McCarthy was testifying as to his negotiations with the D. & C., he asserted that he had asked its freight traffic manager, "if, in the event sufficient business was developed in accordance with an agreement we earlier had, would they not put on the boats that he had purchased rather than chartering more outside boats from some other company, and he said, 'Oh, yes, they would'.". McMillan, general traffic manager of the D. & C. Company, testified that if they had not obtained the ships of the defendant companies "there were many other places they could have been readily obtained". There was to this statement no contradiction. It would seem to be clear, accepting the Commission's finding of future needs based upon the past need for carrying capacity, that the shipping tonnage available before the emergency will again be available when the emergency passes, even if we are not permitted to take judicial notice of the tremendous increase in the American Merchant Marine, in all categories, since the beginning of the war.

It must be remembered that with the single exception of the transitory delays which occurred at the peak of the 1940-41 seasons, the water carrier service accorded the automobile manufacturers by the plaintiffs was entirely adequate, and, as was said in United States v. Rosenblum Truck Lines, 315 U.S. 50, at page 54, 62 S.Ct. 445, 448, 86 L.Ed. 671, "It was the common carriers who offered the complete transportation service to the general public and the shipper." The present applicants offered no such service, and it was on this ground that their application, under the "grandfather clause", was de-

nied. Whether it is economical and in the public interest to expect or require water carriers to maintain, throughout the navigation season, the carrying capacity needed for the peak load in September or early October, we have no occasion to inquire, and the answer is within the competency and, if upon evidence, within the exclusive prerogative of the Commission. It must be observed, however, that the full carrying capacity of the three vessels of the applicants was utilized during the periods in question, and that the grant of a certificate of convenience and necessity to the applicants will not add to the total carrying capacity of carriers engaged in water transportation, anything beyond what was available during the periods of delay, and there is no showing that the applicants intend or are able to add to their tonnage when they become authorized as common carriers. If it is proposed that the applicants acquire additional capacity, it is but added demonstration that such tonnage is or will be available to existing carriers.

The effect of the Commission's finding and order is to introduce new and competing carriers into a field adequately served, without the definite need for the services being shown, and this collides with the clearly defined purpose of the Transportation Act already indicated. While in arriving at this conclusion we give no weight to the argument of plaintiffs that past need offers no basis for judgment of future requirements since the economic era which is to follow a world upheaval may be subject to circumstances that no one can foresee, and so is entirely conjectural, we likewise reject, as conjectural, the conclusion of the Commission that the public interest will be adversely affected if, after the production of automobiles is resumed, the protestants are delayed in acquiring additional facilities. This conclusion fails to take note of the period required for the automobile manufacturers to reconvert their plants to civilian production,—an interim which has given manufacturers, labor, and the public, such grave concern, and the length of which, and its effect upon the national economy, has been so much a subject of public discussion that no court or administrative body can fail to take note of it. The effect of a denial of the application, upon the investment of the applicants in their vessels, is conceded by the Commission to be without controlling force. If we cor-

rectly understand the purpose of the Transportation Act, it is neither controlling nor even mildly persuasive, for, as we understand it, the Commission, in considering an application, is concerned only with the public interest.

It is true that in United States v. Rosenblum Truck Lines, supra, there was involved only an application under the "grandfather clause" of the Motor Carrier Act of 1935, 49 Stat. 543, 552, 49 U.S.C.A. § 309(a), while here we are now concerned with an application for certificates as new carriers, but the order of the Commission and its finding of convenience and necessity are so inseparably based upon the experience of the applicants in operating their boats under charter to an existing carrier, that the observation of the court, in the cited case, "the result would be to create in this case two services offering transportation to the public when there had been only one on the 'grandfather' date", becomes apposite. It is true that the court added, "without allowing the Commission to determine if the additional service was in the public interest." Here the Commission did make that determination, but almost solely on grounds advanced in support of a certificate under the "grandfather clause."

We find ourselves, therefore, in accord with the four dissenting members of the Commission, including its chairman, when they say, "the fact that the applicants' vessels were used as they were to carry automobiles prior to the present emergency and may be needed for that service when the production of automobiles is resumed, does not warrant the conclusion that there will be need for the operation of such vessels by applicants as a new carrier in the field. That will not increase the amount of service formerly provided", and also when they say, "The decision of the majority is based upon too many assumptions and suppositions to be sound as a matter of law".

Upon the question of the Lake Superior rights proposed to be given to the applicants, it would appear that the plaintiffs were given sufficient opportunity to present proofs with respect to that issue even though it was not submitted to the Commission in the original applications. In view of the wide latitude accorded the Commission in regulating its procedure and freeing it of the technical requirements of pleadings and proofs, and the

failure adequately to show prejudice, we are not persuaded that the order of the Commission, if valid, is too broad.

It follows from our discussion that the order of the Commission authorizing the defendant companies to operate as common carriers of motor vehicles between Detroit and ports on Lake Erie and Lake Superior will be enjoined, set aside, and annulled, without prejudice, however, to the consideration of new applications when automobile manufacture is resumed and the public interest in their transportation can be adequately appraised under a peace economy, and without prejudice to the continuance or renewal of temporary authority.

It is so ordered.