**HANNA FURNACE CORPORATION v. UNITED STATES et al.**

Civ. No. 1408.

District Court, W. D. New York.

Dec. 3, 1943.

342

Ralph Ulsh and O'Brian, Hellings, Ulsh, & Morey, all of Buffalo, N.Y. (Harry D. Fenske, of Ecorse, Mich., and James Mc-Evoy, Jr., of Detroit, Mich., of counsel), for plaintiff.

George L. Grobe, U. S. Atty., and Eugene Donnelly, Asst. U. S. Atty., both of Buffalo, N.Y., Edward Dumbauld, Sp. Asst. to Atty. Gen., Edward M. Reidy, Asst. Chief Counsel, Interstate Commerce Commission, of Washington, D.C., Tom C. Clark, Asst. Atty. Gen., and Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission, of Washington, D.C., for the United States and Interstate Commerce Commission.

Before CLARK, Circuit Judge, and KNIGHT and BURKE, District Judges.

KNIGHT, District Judge.

This suit is brought pursuant to statute and under the equity power of this court to enjoin, set aside and annul an order of the Interstate Commerce Commission prohibiting payment to the plaintiff by the defendant-carriers for car switching service performed by the plaintiff within its plant.

Plaintiff (hereinafter called "shipper") is the owner of an industrial plant, situate within the limits of the City of Buffalo, Erie County, State of New York. It produces and ships pig iron and an occasional car-load of other freight. Its inbound railroad line-haul shipments, averaging 10 to 15 carloads daily, consist mainly of coke, but include some coal, dolomite, scrap iron, lime and brick. Its outbound shipments of pig iron range from 40 to 50 carloads per day. This pig iron makes up about three-quarters of all the line-haul switching service. Save for some miscellaneous materials, that is all of the carload shipments out or in. Raw materials to make pig iron, other than coke, are delivered through the Union Ship canal at the north border of the plant. Among the plant structures and facilities are blast furnaces, engine rooms, boiler houses, shops, storage yards, sheds, brick and various single buildings and equipment, etc., located at various points within the limits of the plant property. The shipper has within the plant 66 standard gauge tracks, in total length of 14 miles, with the rails weighing 80 to 90 pounds. It also owns and operates over these tracks seven locomotives, two of which are Diesels weighing 100 tons each and the other two units weighing 55 to 75 tons, some fifty gondola and hopper cars and some other railroad equipment. The plant is served by direct track connection with the Pennsylvania Railroad Company and the South Buffalo Railway Company (a switching road) and by the Lehigh Valley Railroad Company with trackage rights over the Pennsylvania.

The practice is for these carriers to place and pick up cars on so-called interchange tracks just inside the shipper's plant—one set connected with the Pennsylvania Railway and consisting of eight parallel tracks, and one connected with the South Buffalo Railway and consisting of three parallel tracks. The shipper with its own power switches the cars to any desired location in the plant and returns them to the interchange tracks. The Pennsylvania and Lehigh each makes an allowance of 90¢ per loaded car handled by these railroads in line-haul service. Coke constitutes most of the material brought in by the South Buffalo Railway, and no allowance is made:

on these shipments, because they come from a company affiliated with the shipper. Deliveries of other materials, however, are brought in to the South Buffalo Railway interchange tracks by several other roads on which an allowance of 90¢ for each line-haul car is made.

The Commission found that the duty of the carriers to perform ended at the interchange tracks and that the allowance made as aforesaid was an 'unlawful rebate. It purported to act under Section 6(7), of the Interstate Commerce Act, 49 U.S.C.A. § 6(7), which, among other things, prohibits the transportation of property except in conformity with published tariffs and also provides that no carrier shall "refund or remit in any manner or by any device any portion of the rates, fares, and charges" specified in the tariffs. This section prohibits such transportation whether or not any discrimination between shippers results. It provides that "the term 'transportation' * * * shall include * * * all services in connection with the receipt, delivery, elevation, and transfer in transit, * * * of property transported." 1(3) (Sections 2 and 3 of the Act prohibit rebates which are discriminatory.) No discrimination is claimed here.

■ A carrier can not deviate from any rate specified in the tariff for any service rendered in transportation. Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 59 S.Ct. 612, 83 L.Ed. 953; rehearing denied 307 U.S. 649, 59 S.Ct. 792, 83 L.Ed. 1528. The form which the rebate takes is of no consequence. Tap Line Cases United States v. Louisiana & P. R. Co., 234 U.S. 1, 34 S.Ct. 741, 58 L.Ed. 1185. 49 U.S.C.A. § 15(13) permits an allowance only "if the owner of property transported under this chapter (Chapter 1 Interstate Commerce Act) directly or indirectly renders any service connected with such transportation, * * *." In order that an allowance may be made the service performed must be a part of the carrier's duty to perform, and if the service is not a part of the transportation required of the carrier, payment therefor constitutes an unlawful rebate. Baltimore & O. R. Co. v. United States, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318; Merchants' Warehouse Co. v. United States, 283 U.S. 501, 51 S.Ct. 505, 75 L.Ed. 1227. Transportation includes delivery and what is asked as to complete it the carrier must do. New York Cent. & H.

R. R. Co. v. General Electric Co., 219 N.Y. 227, 114 N.E. 115, 1 A.L.R. 1417. So the question here is where "transportation" ends. Is the service performed by the shipper part of the transportation undertaking of the carriers?

In 1931, the Interstate Commerce Commission, upon its own motion, instituted an investigation relating to the payment of allowances by carriers to industries for the performance of terminal switching. This proceeding is known as Ex parte 104. Extended hearings resulting in some sixty-seven supplemental reports and involving literally hundreds of industrial plants receiving allowances were held, and out of these came the report of the Commission that industry spotting service under certain conditions was not included in line-haul and that any allowance to the shipper therefor was illegal and in violation of Section 6, supra. The investigation was particularly directed to the matter of service in spotting cars in large industries. The report is most comprehensive. It sets out certain principles for the practical application of rules as to spotting service. Among these it defined the extent of service required of the carrier. It declared that any "service beyond the point of interruption or interference is an excess of that performed in simple switching or team track delivery" and that "Payment for, or assumption by the carrier of the cost of service performed beyond such points of interruption or interference is found to be unlawful in violation of Section 6 of the act." Rules 8, 9 and 10 formulated by the Traffic Executive Association Eastern Territory, July 18, 1929, are incorporated as a part of the report of the commission. These Rules define the extent of service to be performed by the carrier and certain physical conditions which are to be considered as plant interruption or interference. They limit the extent of service required by the carrier to "point of placement or delivery performed without plant interruption or interference," and provide that "if plant interruption or interference is encountered service after such * * * shall be charged to the plant."

■ It is patent that conditions in various plants differ and that each case must be determined upon the facts established as to it. United States v. American Sheet & Tin Plate Co., 301 U.S. 402, 57 S.Ct. 804, 81 L.Ed. 1186. The Commission has found

344

that the interstate line-haul rates published by the carrier in the instant case cover only the delivery and receipt of shipments at interchange tracks and that beyond that point the service is in excess of "simple switching" or "team track" delivery for which the shipper only is liable.

The shipper takes exception to numerous findings of the Commission and makes the contention, in effect, that the conclusions of the Commission are not supported by substantial evidence and are contrary to the evidence and to the Commission's relevant findings of facts; that the Commission has disregarded uncontradicted evidence which is contrary to its conclusions; that the order of the Commission is arbitrary and discretionary and that the determination of the extent of transportation service to which the shipper is entitled by comparison with service not fixed is arbitrary, unreasonable and legally erroneous.

The Supreme Court has many times laid down rules which are definitely applicable here.

"The credibility of witnesses and weight of evidence are for the Commission and not for the courts, and its findings will not be reviewed here if supported by evidence." Merchants Warehouse Co. v. United States, 283 U.S. 501, 508, 51 S.Ct. 505, 508, 75 L.Ed. 1227. "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 54 S.Ct. 692, 694, 78 L.Ed. 1260. "The findings of the Commission are made by the law prima facie true. This court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience. * * * And in any special case of conflicting evidence a probative force must be attributed to the findings of the Commission, which, in addition to 'knowledge of conditions, of environment, and of transportation relations,' has had the witnesses before it and has been able to judge of them and their manner of testifying." Illinois Cent. R. Co. v. Interstate Commerce Comm., 206 U.S. 441, 454, 27 S.Ct. 700, 704, 51 L.Ed. 1128. Referring to the last-mentioned case, the Supreme Court in Rochester Tel. Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 761, 83 L.Ed. 1147, which case went up on appeal from a three-judge court in this district, said: "Recognition of the Com-

mission's expertise also led this Court not to bind the Commission to common law evidentiary and procedural fetters in enforcing basic procedural safeguards. From these general considerations the Court evolved two specific doctrines limiting judicial review of orders of the Interstate Commerce Commission. One is the primary jurisdiction doctrine, firmly established in Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075. Thereby matters which call for technical knowledge pertaining to transportation must first be passed upon by the Interstate Commerce Commission before a court can be invoked. The other is the doctrine of administrative finality. Even when resort to courts can be had to review a Commission's order, the range of issues open to review is narrow. Only questions affecting constitutional power, statutory authority and the basic prerequisites of proof can be raised. If these legal tests are satisfied, the Commission's order becomes incontestable." Vide also: Interstate Commerce Comm. v. Union Pac. R. Co., 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308. In view of the investigations made by the Commission in the matters of concern here, the "knowledge of conditions, of environment and of transportation relations" so acquired has additional weight.

The rule is too well settled to admit of any doubt that a finding by the Commission, supported by substantial evidence, must be sustained.

The defendant-carriers from in or about June 2, 1921, until November 11, 1942, published and filed terminal allowance tariffs which provided compensation to the shipper at the rate hereinbefore specified. On November 1, 1941, defendant carriers filed with the Interstate Commerce Commission tariffs to become effective April 19, 1942, providing for cancellation of the aforesaid terminal allowance tariffs. In the investigation aforesaid relating to terminal service of carriers and instituted by the Commission in or about the years 1931 and 1932, considerable testimony was taken specifically directed to this shipper. It included thirty pages of the record. In 1942 the Commission of its own motion re-opened the proceedings in respect to the terminal services of the plaintiff's plant, and further testimony was taken and that is included in the record before this court.

■ The fact that the tariffs filed permitted the allowance for a long period of time has no bearing. Merchants' Warehouse Co. v. United States, supra; Interstate Commerce Comm. v. Louisville & N. R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L. Ed. 431; United States v. Louisville & N. R., 235 U.S. 314, 35 S.Ct. 113, 59 L.Ed. 245; Assigned Car Cases, 274 U.S. 564, 47 S.Ct. 727, 71 L.Ed. 1204. Any significance which might be thought to be attached to it is eradicated when the magnitude of the work of the Commission in its investigation following Ex parte 104 is considered. Certain of the allowances considered in the Tin Plate case had been made for a longer period of time than here.

The I. C. C. said in Ex parte 104 that only simple switch or team track delivery was required and that when "interference or interruption" prevents such delivery, services beyond such point are in excess of simple switching or team track delivery. This finding in the report was sustained in United States et al. v. American Sheet & Tin Plate Co., supra. That case was a consolidation of six several cases, each involving the question of the right to allowance for spotting services. The court there, in part, said [301 U.S. 402, 57 S.Ct. 809, 81 L.Ed. 1186]: "It is sufficient now to say that in every case the Commission found, upon sufficient evidence, that the cars were, in the first instance, placed upon lead tracks, interchange tracks or sidings and subsequently spotted from these tracks; in each instance the spotting service involved one or more operations in addition to the placing of the car on interchange tracks, such as moving it to plant scales for weighing, or some additional burden, such as conformance to the convenience of the plant, supply of special motive power required by the plant's layout or trackage or some other element which called for excessive service greater than that involved in team track spotting or spotting on an ordinary industrial siding or spur. We are unable to say that the findings in respect of the individual plants lacked support in the evidence." The expression "simple switching" defines itself, but there seems to be some confusion as to the meaning of "team track" switching or delivery. Team track switching or delivery has been described by counsel for the government as meaning putting cars out on a spur belonging to railroad to which there is access by

wagons or other conveyances and in which the unloading must be made at convenience of the railroad. This is in distinction from a simple switch placement which means the placing of a car on a siding leading to a plant. However, the general Report of the Commission and the rules included therein define what is in excess of team track delivery and that is "when a carrier is prevented at its ordinary operating convenience from reaching points of loading or unloading within a plant, without interruption or interference by the desires of an industry or the disabilities of its plant, such as the manner in which the industrial operations are conducted, the arrangement or condition of its tracks, weighing service, or similar circumstances." So it is unnecessary to find a definition for "team track" delivery if we know what excess of "team track" delivery is.

The main basis for the Commission's order is that there is such interference and interruption of carriage as obviates the necessity of delivery beyond the interchange tracks. What are some of the undisputed facts?

A blue print in evidence shows in detail the numerous and extensive plant buildings and their facilities; a net work of 66 standard railroad tracks, 14 miles in total length, connecting directly or indirectly with these buildings and 6 separate points where materials are loaded or unloaded. All these are enclosed in a plot ranging from 800 to 1300 feet in width and 3300 feet in length.

For the first six months in 1930 the shipper's rail crew shipped 20,507 loaded cars. Of these 12,875 were switched in intraplant service; 7,632, or only 37%, were interchange cars and of these 5,326 were interchange loads moving from and to points in the Buffalo Switching District and 2,306 were interchange line-haul loads on which the allowance aforesaid was made.

On the average 113 loaded cars were switched daily, the daily engine hours required were 35½, and this switching was done twenty-four hours each day. Altogether there were several hundred switch movements daily. One locomotive of the defendant's seven was constantly in use. The computed cost of service performed by engines' crews averaged $1.73 per loaded car. It is undisputed that the 1930 period is fairly comparable with the like period of 1942.

While there is no direct evidence as to the movement of particular materials from the unloading points to the places where utilized, the location of plant buildings and facilities, the number and location of the tracks, the fact that the plant moved daily twice as many loaded cars as were included in pig iron and coke deliveries in and out, the large number of cars switched exclusive in plant service, and the nature of the materials and the plant products are evidence from which the Commission could find what the movement of much of these materials was. For instance, the Commission could well find that fire brick had to be moved from the designated unloading point to the furnaces at a considerable distance and in locations on different tracks; that lumber for plant building or for use within the various structures had to be moved from two unloading points to these structures; that coal and coke had to be moved from the coal and coke stock piles to different furnaces on different tracks. The slag pits are located near the trestle. Admittedly the ladles of molten liquid had to be moved from the furnaces in the northeast part of the plant to the pig casting house, and this could only be done by movement over several tracks and thus several switches. This by-product was moved by the Buffalo Slag Company out of the shipper's plant to the slag company plant. Removal from these pits had to be made over different tracks and by several switch movements. Considering the total product of pig iron, the amount of slag must have been considerable. As the evidence shows, coke, which was largely brought in by the South Buffalo railroad, was moved from the interchange tracks numbered 3, 4 and 5 easterly to track 1, thence west to the interchange tracks directly connected with the Pennsylvania; west over the interchange tracks to the lead track B from the Pennsylvania and then northeasterly to the coke and scrap unloading point. It will be seen that this movement necessarily involved at least three switching movements and at least two more if track 16 was being used for the unloading or removal of coal. This can well be seen to cause interference. Empties from any of these points, of course, necessitate a re-tracing of the movements as stated. Other line-haul cars, from different railroad lines to the South Buffalo interchange tracks, had to be delivered at different points in the plant. These deliveries and returns could only be

made by several switch movements to reach the spotting points. Further, cars other than empties for pig were delivered at the 8 track exchange for certain materials for use at various points in the plant.

The evidence shows that it costs the shipper $1.73 per line-haul car, as above stated, while it receives only 90¢ from the carrier. There is proof that it would cost the carrier much more than the present allowance to spot these cars. Indeed, a representative of a railroad testified that the spot switching is "Much more costly than yard operation." There is evidence that the railroads get "$4 or $5 a car as their total revenue on the switch traffic, or something like that." There is proof that the allowance agreement was entered into for the convenience of both the shipper and the carrier. There is proof that the shipper has reason why it prefers to spot the cars, and the Commission can conclude what they are. These and many other factors are significant as going to show interruption of service if the carrier spots.

Mr. Frederickson, shipping clerk of the shipper and its principal witness, testified:

"Q. * * * if the industry power gave way to the carrier, gave it the right of way, would not the effect be to delay your industrial operation to some extent. A. You wanted to know if there would be interference either with the railroad or plant operation of its locomotive?

"Q. Exactly, either against the railroad power or against the industrial power by the railroad power? A. I don't think there would be, but on account, probably the layout of the tracks, might be the railroads would be free to do their work without interfering with plant operation."

Again he testified that the cars on interchange tracks are intermingled with cars which are shifted from one point in the plant to another, and in answer to the question as to whether you would have to segregate the line-haul carrier cars from cars which are shifting from one to another he answered: "Well they would have to be separated, if that is what you mean * * *. I don't think they would be greatly mingled. They might be on the same track." In answer to leading questions by shipper's counsel, the witness did testify, in effect, that there would not be interference with plant movements through spotting by the carriers. The effort was made to show how this could be avoided, save by

holding the intra-plant cars back while the carrier was spotting. The most liberal construction that can be placed upon his testimony is that by the stoppage of intra-plant cars in movement deliveries could be made to certain spotting points without interference. Of course, this obviously could be a condition in any industry, but it totally disregards the operating needs of the plant. The operating needs of this plant are well shown by the statement of the shipper's counsel that "We have seven switch engines working, because there is a lot of intra-plant manufacturing operation requiring movement of cars." There is proof also that intra-plant switching in addition to interchange switching is necessary.

Empties via the Pennsylvania are delivered once or twice daily on the eight track interchange. There is no regular time of delivery. All the railroads had to do was to keep these tracks supplied with sufficient cars. The shipper, as its necessities required, spots the cars for pig iron shipment on the three tracks opposite the pig casting machines. After these cars are shifted around by the use of shipper's car pulley, they are loaded and shifted back over one or more of the tracks to the loading scales. When loaded they are moved to the receiving and delivery tracks, thence east and then west back to the eight track interchange tracks. Spotting and return of the loaded cars, as will be seen by the blue print, entail movements over numerous different tracks and turning of numerous switches.

While it is true that cars can be spotted directly from the Pennsylvania to the pig casting machine, without interference or interruption, save for a few switching movements, and provided the tracks are clear, it cannot be so done to meet the ordinary requirements and needs of the industry, and we believe that what those needs are the Commission had the right to determine, not alone by the blue print, but also by the nature and volume of the business shown by the evidence. The Commission may well have found that the equivalent of "simple track or team track delivery" could not be made from the Pennsylvania to the pig machine, because there is space for not to exceed nineteen cars at that point, that at least three deliveries of pig empties would be required each day, that the shifting of the empties and loaded cars in order to move the loaded cars to the

weighing scales would interfere with other actions, that Lehigh and Pennsylvania cars would be intermingled, that lime and dolomite cars off the Pennsylvania would have to be spotted either by movement through the three tracks at the pig machine or around through one of the eight exchange tracks; that any movement of loaded cars west and east to these tracks would involve several movements and would interfere with deliveries from the South Buffalo; and, further, that shifting of loaded cars from the pig loading point back east to the scales would interrupt the movements of empties and loads. The point of weighing is of special significance. Weighing is for the benefit of the shipper. Again, there is a pig storage along side of track 14, and unloading pig there would interfere with deliveries to and from the pig machine. It is asserted that loaded cars could be moved to the Pennsylvania from the receiving and delivery tracks 6 and 9, but such would both interfere with inbound deliveries and require several switch movements. Particularly is this so since Lehigh and Pennsylvania cars have to be separated. Any spotting from the South Buffalo to any of the points of delivery would involve numerous switch movements and carriage over numerous tracks. A single carrier delivery would lessen somewhat interference and interruption, but, because of the large intra-plant movements, other than line-haul, it would not obviate interference at the pig unloading point. While it might be possible to so rearrange the trackage within the plant that a single carrier could spot without interference anywhere, the Commission has passed on the conditions as then existing.

It is urged that the necessity of opening and closing switches does not constitute interference or interruption of service. Certainly that is a thing which is properly considered as part of the movement over numerous tracks and under conditions which are shown here. As General Electric Co. v. New York Cent. & H. R. R. Co., 14 I.C.C. 237, held, carriers "can not be called upon * * * to make deliveries through a network of interior switching tracks * * *. Their obligation as common carriers involves only a delivery and acceptance of carload shipments at some reasonably convenient point of interchange." Terminal Allowance to St. Louis Coke & Iron Co., 85 I.C.C. 591.

The record does not disclose whether the engines of the Pennsylvania used in its deliveries and weighing 123 to 138 tons each could be operated upon the trestle, though they could be used on the other tracks. It does appear that the Pennsylvania has smaller locomotives which it uses in switching cars over tracks which will not accommodate heavier engines. The shipper employs engine weighing from 55 to 100 tons and the Lehigh uses Diesels weighing 100 tons.

An examination of the decisions of the Commission in the industries considered in United States v. American Sheet & Tin Plate Co., supra, will disclose that each of these is fairly comparable in its material facts with the instant case. We believe there is little in the decisions in these cases showing specifically what the intra-plant movements were, but there, as here, the conclusions in this respect have been largely drawn from description of the nature of the industry, the layout of its tracks, and the extent of operation over these. It is believed that the decision in that case is controlling here, and in support of this view we refer particularly to that part of the opinion hereinbefore quoted.

We are further confirmed in our opinion by the case of United States v. Pan American Petroleum Corp., 304 U.S. 156, 58 S. Ct. 771, 773, 82 L.Ed. 1262: "We have examined the record and are of opinion that in each case there is substantial evidence to support the Commission's findings. No useful purpose will be served by a detailed recital of the evidence and it must suffice to say that, while the conditions in the various plants differed, in all of the cases the Commission had before it maps exhibiting the character and extent of the plant trackage, its relation and accessibility to the main line tracks of the carriers concerned, and proofs as to the volume and nature of intraplant car movements, the amount of engine service required and other relevant facts. The value and weight of the evidence given by railroad and plant executives, and the inferences to be drawn from it, were for the Commission. In some instances the inconvenience and delay to the carriers in performing plant services were more obvious than in others, but we are unable to say that in any case the Commission's orders were not based upon substantial evidence."

The exceptions to the findings of the Commission are disallowed. The order of the Interstate Commerce Commission prohibiting the payment of an allowance to the shipper by the defendant-carriers for switching service performed by the shipper within its plant is sustained upon the ground and for the reason that there is substantial evidence to support the Commission's finding that the carriers' service for transportation was complete upon the delivery of cars to the interchange tracks and that spotting within the plant is not included in the service for which the line-haul rates were fixed.

Judgment is therefore entered for the defendants.[1]

BURKE, District Judge (dissenting).

The order of the Commission must find support in the evidence on at least one of the following grounds: that the plaintiff's trestle would not support railroad locomotives, that opening and closing of switches would constitute interference, or that intra-plant operation would cause interruptions with car spotting movements if conducted by the railroads. There is no evidence and no finding that the trestle would not bear the weight of railroad locomotives. There is no basis in precedent for sustaining such an order of the Commission on the ground that opening and closing of switches constitutes an interference in car spotting movements. It is inherent in the operation. There is no evidence that the number of switches required to be opened or closed would be burdensome.

The plaintiff and its predecessor have for twenty-two years performed their own car spotting under an allowance from the railroads. The only evidence as to the manner of car spotting that was before the Commission related to how it had been done by the plaintiff under those circumstances. Plaintiff had the right to conduct those operations in its own way and suited best to its own convenience. It does not follow that it would have to be done in the same manner if the service were performed by the railroads. The Commission had before it a map showing the layout of plaintiff's tracks and buildings and evidence as to the volume of car movements conducted within the plant. On that evidence it has based its finding that car spotting, if conducted by the railroads, "would be marked

---

[1] Ex parte 104, 209 I.C.C. 11; and Hanna Furnace Corp. Terminal Allowance, 253 I.C.C. 613.

by frequent interruptions and delays occasioned by intra-plant switching interference". The only evidence on the question of possible interference with car spotting movements, if conducted by the railroads, was the testimony of Frederickson, assistant to plaintiff's general superintendent, who was competent to testify as to the requirements of the industry and who had knowledge of the way plaintiff's business was and could be conducted. He testified regarding the requirements and manner of operation of defendant's plant. He said that there would be no interference by intra-plant traffic with car spotting movements and explained that the plaintiff would not have to conduct its car movements at the same time and in the same location where the railroads would be performing car spotting service. The Commission has rejected this testimony. There is no more ground for holding that there would be interference on the basis of the Commission's expert knowledge, without evidence, than there would be for holding that the plaintiff's trestle would not support the weight of railroad switching engines on the basis of the Commission's expert knowledge, without evidence. In United States v. Pan American Petroleum Corp., 304 U.S. 156, 58 S.Ct. 771, 82 L.Ed. 1262, the court pointed out that the Commission had before it maps exhibiting the character and extent of the plant trackage, its relation and accessibility to the main-line tracks of the carriers concerned and proofs as to the volume and the nature of intra-plant car movements, the amount of engine services required and other relevant facts. I take this to mean that, included in the proofs as to the nature of intra-plant car movements and other relevant facts, there was evidence not only as to the materials being carried in intra-plant car movements but also as to the time when it was necessary in the industry to conduct such car movements.

I think the Commission's finding that car spotting, if conducted by the railroads, "would be marked by frequent interruptions and delays occasioned by intra-plant switching interference" is not supported by substantial evidence, and is contrary to the only evidence on the subject in the case and, as such, is beyond the power of the Commission. Interstate Commerce Comm. v. Louisville & N. R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431. I would give judgment for the plaintiff.