## BODINE & CLARK LIVESTOCK COMMIS-SION CO. v. GREAT NORTH-ERN. RY. CO.

No. 6824.

Circuit Court of Appeals, Ninth Circuit.

Feb. 13, 1933.

David Sandeberg and Arthur M. Geary, both of Portland, Or., for appellant.

Charles A. Hart, of Portland, Or., and. C. S. Albert, of Seattle, Wash., and Fletcher Rockwood and Carey, Hart, Spencer & Mc-Culloch, all of Portland, Or., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NETERER, District Judge.

SAWTELLE, Circuit Judge.

Based upon a sole assignment of error, this is an appeal from a judgment of the District Court in favor of the appellee, the defendant below. The judgment recites that the plaintiff-appellant filed its demurrer to the further and separate answer of the defendant-appellee, contained in the amended answer to the second amended complaint of the plaintiff; that the demurrer was overruled; and that the plaintiff stated in open court that it did not desire to plead further, but would rely upon its demurrer. The case accordingly comes here on the judgment roll.

The appellant alleged in its complaint that on August 31, 1926, its assignor was the owner of eight carloads of cattle, consisting of 224 steers, at Fort Browning,

Mont. The plaintiff-appellant and assignee is the commission firm that purchased the cattle for the shipper.

The appellant further alleged in its complaint that on August 31, 1926, the shipper requested the appellee to bill the eight carloads of cattle to San Francisco, Cal., via Portland, Or., "feed in transit at Gazelle, California," and that the shipper was ready to pay all charges in the appellee's duly filed tariff; that upon this tender it was informed for the first time by the appellee that the latter would not move the cattle via the requested route until Saturday, September 4, 1926; and that this refusal on the appellee's part was in violation of its duty as a common carrier, and in violation of the Interstate Commerce Act, and the appellee's duly filed tariff.

The appellant then alleged that, in order to minimize the loss, the shipper was forced to ship the cattle via a more expensive and circuitous route, and had to pay in freight charges $414.50 per car instead of $271.35 per car. As a result, according to the complaint, the cattle arrived at Gazelle on or about September 10, instead of on or about September 6, the time they should have arrived if they had been transported via Portland, with reasonable dispatch, with the result that they were "seriously injured and damaged."

The separate answer, to which the demurrer was interposed, alleged that the appellee's actions were in accordance with an established operating practice of the appellee; namely, that of limiting west-bound movements of live stock to a weekly train operated on Saturday of each week and that during the pendency of this suit the Interstate Commerce Commission, upon complaint of the appellant, determined that the operating rule was not unreasonable. The answer further sets forth that the operating rule was not included in any tariff published or filed, but was put into effect through the distribution to station agents of a circular specifying the schedule adopted, by posting notices to the public at the stations affected, and by oral notice to shippers given by the station agents of the appellee.

The answer also alleges that the shipper tendered its shipment to the appellee for west-bound transportation on a day other than Saturday, and directed the appellee not to route the said shipment west bound to its destination, but to route it east bound to Butte, Mont., and thence over the lines of the Oregon Short Line and the Southern Pacific Company; that the shipper made no request for immediate movement west bound, but, on the contrary, directed the appellee's agent to bill the shipment east bound; that the appellee was at all times willing to accept and transport the shipment on its regular stock loading day, which was three days following the time when the shipper first tendered its shipment for transportation; and that the appellee was willing to accept the shipment as a special movement upon request of the shipper and upon a showing indicating necessity for such special movement; but the shipper made no such request.

One ground specified for the demurrer was that the above operating rule restricting cattle shipments to Saturday of each week "was null and void * * * because not published in a duly filed tariff as required by the 1920 Transportation Act." Other grounds alleged were that the rule was "unjustly discriminatory and unduly prejudicial"; that it was of "indefinite terms," all of which was in violation of either the 1920 Transportation Act (41 Stat. 456) or the Interstate Commerce Act (49 USCA § 1 et seq.); and that, "although not included in a tariff," the rule constituted an attempt by the appellee "to restrict routing in violation of the published tariff."

During the pendency of this action in the District Court, on motion to strike defendant's further and separate answer, the late Judge Robert S. Bean held that: "This regulation is an administrative regulation, and it seems to me under the ruling laid down in Northern Pacific Ry. v. Solum (247 U. S. 477 [38 S. Ct. 550, 62 L. Ed. 1221]) its reasonableness is for the Interstate Commerce Commission and not the court, and as long as it stands unrevoked by the Commission, the court must give it validity. I do not understand that it is in violation of the Interstate Commerce Act or of the tariff."

In the Solum Case, relied upon by Judge Bean, the court said, at page 483 of 247 U. S., 38 S. Ct. 550, 553: "The railway contends that, since the administrative question upon which its liability depends involves the reasonableness of a practice in interstate commerce and the traffic actually moved in interstate commerce, the court had no jurisdiction to adjudicate the controversy until that administrative question had been determined by the Interstate Commerce Commission. The shipper, on the other hand, urges that the rule which requires such preliminary determination of administrative questions by the Commission applies only to those cases where

the question involved is whether a particular rate is unreasonable or whether a particular practice is discriminatory. But the rule is not so limited. It applies, likewise, to any practice of the carrier which gives rise to the application of a rate. [Several cases cited.]"

See, also, the Abilene Cotton Oil Company Case, infra, at pages 440, 441 of 204 U. S., 27 S. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075.

As a result of Judge Bean's ruling, the appellant obtained a suspension of the action in the District Court while it presented the rule of practice in question to the Interstate Commerce Commission for determination as to its reasonableness and validity.

In the first report, a division of the Commission held: "Manifestly, observance by defendant [appellee] of the operating rule assailed, which lacked tariff force because not published and filed in the manner prescribed in the act, did affect the cost to complainant [appellant] of the transportation described. Defendant by publication of a rate therefor held itself out to accept and transport shipments of livestock over the route specified by complainant. In the absence of tariff authority its refusal to accept complainant's shipments when tendered for transportation over the route via which its published rate applied constituted an unlawful practice." 167 I. C. C. 582, 583.

The case was reconsidered by the full Commission, and was decided on May 4, 1931. The majority report found in favor of the appellee, with four of the Commissioners dissenting. Id., 174 I. C. C. 363. At page 364 the report says: "It is customary to transport certain traffic only on trains assigned to that traffic, and the rule in question is not unique as will hereinafter be shown. The inclusion of such operating rules and train schedules in the tariffs would serve no useful purpose but only tend to encumber them. The act should be interpreted reasonably in the light of custom and practical needs, and so interpreted, we find no requirement that an operating rule or train schedule such as that assailed must be incorporated in the tariffs."

On November 24, 1931, the appellee filed an amended answer to second amended complaint, in which, as a further and separate answer, it was recited that the Interstate Commerce Commission had found that the rule assailed "was not and is not unreasonable or otherwise unlawful," and that thereupon the Commission had made its order dismissing the appellant's complaint. To this further and separate answer the appellant filed the demurrer mentioned above.

The following paragraphs of sections 1, 3, and 6 of the Interstate Commerce Act, as amended (49 USCA §§ 1, 3, 6), are referred to as applicable to the instant case:

Section 1, par. (4). *"Duty to furnish transportation and establish through routes; division of joint rates.* It shall be the duty of every common carrier subject to this chapter engaged in the transportation of passengers or property to provide and furnish such transportation upon reasonable request therefor. * * *"

Par. (6). *"Classification of property for transportation; regulations and practices.* It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample, and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this chapter which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this chapter upon just and reasonable terms, and every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful."

Par. (10). *" 'Car service' defined.* The term 'car service' in this chapter shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property, including special types of equipment, and the supply of trains, by any carrier by railroad subject to this chapter."

Par. (13). *"Rules and regulations as to car service to be filed, etc.* The commission is authorized by general or special orders to require all carriers by railroad subject to this chapter, or any of them, to file with it from time to time their rules and regulations with respect to car service, and the commission may, in its discretion, direct that such

rules and regulations shall be incorporated in their schedules showing rates, fares, and charges for transportation, and be subject to any or all of the provisions of this chapter relating thereto."

Section 3, par. (1). *"Undue preferences or prejudices prohibited.* It shall be unlawful for any common carrier subject to the provisions of this chapter to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."

Section 6, par. (1). *"Schedule of rates, fares, and charges; filing and posting.* Every common carrier subject to the provisions of this chapter shall file with the commission created by this chapter and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. If no joint rate over the through route has been established, the several carriers in such through route shall file, print and keep open to public inspection as aforesaid, the separately established rates, fares and charges applied to the through transportation. The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the commission may require, all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee. Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. The provisions of this section shall apply to all traffic, transportation, and facilities defined in this chapter."

Par. (7). *"Transportation without filing and publishing rates forbidden; rebates; privileges.* No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter, unless the rates, fares, and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified * * * in the transportation of passengers or property, except such as are specified in such tariffs."

The appellee insists that since the question presented herein involves the "supply of trains," it comes within the above-quoted statutory definition of "car service," and that consequently the operating rule here assailed did not need publication in a tariff in order to be valid. While it may be conceded, however, that the language of the statute defining "car service" seems general in character, the Supreme Court has held that it is limited in scope solely to situations involving a purpose "to make these [railroad] instrumentalities available in emergencies to a carrier other than the owner." The "limited sense" of the phrase "car service," in paragraph 10—the defining paragraph—is elaborated upon in the case of Peoria & Pekin Union Railway Company v. United States et al., 263 U. S. 528, 533, 534, 44 S. Ct. 194, 196, 68 L. Ed. 427, in the following language: "The argument that the authority of the Commission over car service should be construed to include the requiring of switching rests upon paragraph 10 of amended section 1 of the Act to Regulate Commerce [49 USCA § 1 (10)]. But 'car service' connotes the use to which the vehicles of transportation are put; not the transportation service rendered by means of them. Cars and locomotives, like tracks and terminals, are the instrumentalities. To make these instrumentalities available in emergencies to a carrier other than the owner was the sole purpose of subparagraphs (a), (b), and (c). It is to this end only, that

provision is made by paragraph 10 for the 'movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property.' "

It will be observed that paragraph 10 is the very provision relied upon by the appellee as defining "car service" to include the "supply of trains." Mr. Justice Brandeis, who delivered the opinion of the court in the Peoria & Pekin Case, devotes a page length footnote to stressing "this limited sense" of the expression, "car service."

We are aware that, in Train Service on Northern Pacific, 112 I. C. C. 191, 193–195, the Interstate Commerce Commission relied upon the definition of paragraph 10 as giving it jurisdiction to determine and prescribe the practice with regard to the "supply of trains," even in nonemergency cases, and that the Commission sought to distinguish the facts in the controversy then before it from those in the Peoria & Pekin Case, supra. We are also mindful that the Peoria & Pekin Case involved an emergency order dealing with switching operations, by which one carrier was required to switch cars for another. It is true that neither an emergency order nor switching operations are an element here; but the language of the Supreme Court, limiting the definition of "car service" as applicable only to "instrumentalities available in emergencies to a carrier other than the owner," is sufficiently definite to bar our relying upon such definition in the instant case, where diversity of carriers is not involved.

It is not necessary, however, for us to depend upon that definition, since we base our decision in this case upon other grounds.

There are two principal questions to be determined in this case:

(1) As a matter of law, was the operating rule restricting west-bound shipments to one train a week, except as a special movement upon a showing of necessity, null and void because not published in a duly filed tariff, as required by 49 USCA § 6 (1) and (7)?

(2) As a matter of fact, was the operating rule unreasonable or discriminatory, because it did not provide for proper dispatch, or because it was too indefinite, or for any other reason?

It will be observed that the operating rule under discussion did not, in a practical sense, "in any wise change, affect, or determine any part or the aggregate of" the "rates, fares, and charges" that the appellee collected from the appellant, or "the value of the service

rendered." It is only charges or privileges or facilities that do so affect the rates that must be published, under the provisions of section 6 (1), supra. The alternative right of a shipper to send his goods east bound at a different and higher rate does not affect the charge made for a west-bound shipment.

As we have seen, the Commission found that the "rule assailed was no more than a train schedule for livestock, and it has never been considered necessary to include such schedules in the tariffs," and added: "The time for train departures and whether they will stop at certain stations may affect the cost of transportation in the same manner as the rule under consideration." 174 I. C. C. 363, 364.

But, as we have seen, the Commission held that a reasonable interpretation should be given to the act.

In other cases, for many years past, the Commission has held a similar view as to rules that might have "changed, affected, or determined" "the value of the service" to an extent as great as is claimed for the operating rule here under consideration.

For instance, the Commission has repeatedly held that the law does not require that embargoes "be published as tariffs are published." La Fayette Box Board & Paper Company v. Director General, etc., et al., 59 I. C. C. 105, 107; Joseph L. Lieberman et al. v. Chicago & Northwestern Railway Company et al., 59 I. C. C. 599, 600; American Wholesale Lumber Association v. Director General, etc., et al., 66 I. C. C. 393, 398; Empire Lumber Company v. Director General, etc., et al., 88 I. C. C. 424, 425.

In other words, whatever the uncertainty and ambiguity that the statute might have contained with regard to the publication of operating orders of the kind with which we here have to deal, such uncertainty and ambiguity have been dispelled by the "practical interpretation * * * by the executive department charged with its [the statute's] administration." Such interpretation, therefore, "if acted upon for a number of years, will not be disturbed except for very cogent reasons." Logan v. Davis, 233 U. S. 613, 627, 34 S. Ct. 685, 690, 58 L. Ed. 1121, and cases there cited. See, also, United States v. Burlington & Missouri River Railroad Company, 98 U. S. 334, 341, 25 L. Ed. 198; United States v. Hammers, 221 U. S. 220, 228–229, 31 S. Ct. 593, 55 L. Ed. 710; Kern River Company et al. v. United States, 257 U. S. 147, 154, 42 S. Ct. 60, 66 L. Ed. 175; Swendig et al. v. Washington Water

Power Company, 265 U. S. 322, 331, 44 S. Ct. 496, 68 L. Ed. 1036; United States v. Minnesota, 270 U. S. 181, 205, 46 S. Ct. 298, 70 L. Ed. 539; Wisconsin et al. v. Illinois et al., 278 U. S. 367, 413, 49 S. Ct. 163, 73 L. Ed. 426.

The "persuasively determinative" character of executive construction of such a statute is too well established in the law to warrant our further laboring the point.

We therefore conclude that the operating rule in question did not depend upon publication as a tariff for its validity.

We next address ourselves to the second important question in this litigation; namely, whether or not the operating rule limiting west-bound shipments of cattle to Saturday of each week, was unreasonable, prejudicial, or discriminatory.

On this point, the Commission found in part as follows:

"The evidence shows that the special live-stock train was put on in order to afford better service on westbound shipments. By reducing tonnage to 60 per cent or less of ordinary 'drag' trains, the time in transit was reduced about one-half, and this eliminated the necessity of a stop for feeding and resting the stock before reaching Spokane, Wash. This stop consuming about five hours is required under the Federal 28-hour law where the run can not be completed within that time, and heavy penalties are provided if the carrier miscalculates or neglects to make the stop for which adequate facilities are available at only one or two points between Fort Browning and Spokane. It is also shown that claims for damages on account of delay and rough handling were materially reduced after this service was inaugurated. Defendant takes the position that this special livestock service could not be maintained if shippers were permitted to use other trains. The total amount of livestock shipped westbound from these stations to all destinations averaged only 11.1 carloads per week in 1928. Some of the largest shippers or receivers of livestock in this territory expressed a preference for the special livestock train once a week to the use of other trains on any day without the special service. * * *

"Upon reconsideration, we find that the rule assailed was not and is not unreasonable or otherwise unlawful." Pages 365, 366 of 174 I. C. C.

As to the question of reasonableness of rates, we find that the Supreme Court has repeatedly declared that the finding of the Com-

mission is conclusive if supported by substantial evidence, unless there is some irregularity in the proceeding or some error in the application of the rules of law. We find no such error in the instant case.

In Western Paper Makers' Chemical Company et al. v. United States et al., 271 U. S. 268, 271, 46 S. Ct. 500, 501, 70 L. Ed. 941, the court said: "The determination whether a rate is unreasonable or discriminatory is a question on which the finding of the Commission is conclusive if supported by substantial evidence, unless there was some irregularity in the proceeding or some error in the application of the rules of law. [Cases cited.] No such irregularity or error is shown. In making its determinations the Commission is not hampered by mechanical rules governing the weight or effect of evidence. The mere admission of matter which under the rules of evidence applicable to judicial proceedings would be deemed incompetent does not invalidate its order. [Case cited.] There was ample evidence to support the finding that the joint through rates regarded as entireties were reasonable and justified. Prior existing rates, whether locals or such proportionate rates from a key point to points of destination as were made applicable to this particular class of traffic, or through rates upon other commodities moving from similar points of origin, are proper matters for consideration in establishing new through rates. To consider the weight of the evidence is beyond our province."

See, also, New England Divisions Case, 261 U. S. 184, 204, 43 S. Ct. 270, 67 L. Ed. 605; Virginian Railway Company v. United States et al., 272 U. S. 658, 663, 47 S. Ct. 222, 71 L. Ed. 463.

Similarly, the Supreme Court has held that, as to the question of whether certain warehouses were in fact public freight stations, was one as to which "the credibility of witnesses and weight of evidence are for the Commission and not for the courts, and its findings will not be reviewed here if supported by evidence." Merchants' Warehouse Co. v. United States et al., 283 U. S. 501, 508, 51 S. Ct. 505, 508, 75 L. Ed. 1227.

Again, in United States et al. v. Erie Railroad Co. et al., 280 U. S. 98, 102, 50 S. Ct. 51, 53, 74 L. Ed. 187, the court held that the finding of the Commission, that a broker acted only as an agent in a sale of foreign wood pulp, "ought to have been accepted by the District Court as conclusive, since there was ample evidence to sustain it."

In Indian Valley R. R. v. United States

et al. (D. C.) 52 F.(2d) 485, 486, a three-judge case decided in this circuit, the court held: "It is not for the courts in reviewing orders of the commission to weigh the evidence or inquire into the soundness of the reasoning by which the commission reached its conclusions, or to question the wisdom of the commission's action, if within the scope of its authority. [Many cases cited.]"

There is nothing in the present record to indicate that the Commission did not have ample evidence to support its findings. Indeed, the recitals contained in the report of the Commission, quoted above, indicate affirmatively that there was in fact ample evidence to sustain its finding that the operating rule was not unreasonable, and we so hold.

The appellant relies heavily upon two cases as supporting its contention that the operating rule in question was improper. The decisions referred to are Chicago & Alton Railroad Co. v. Kirby, 225 U. S. 155, 32 S. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914A, 501, and Davis, etc., v. Cornwell, 264 U. S. 560, 44 S. Ct. 410, 68 L. Ed. 848. Since each case, as the appellant concedes, involved a special contract or agreement, not provided for in the railroad company's tariff, and therefore preferential and illegal, neither case is applicable here; for in the present controversy no question of a special contract is presented.

Finally, the appellant contends that it is a general principle of the common law that live stock must be accepted and transported with reasonable dispatch, and that this is still a rule which the Interstate Commerce Act has endeavored by its very terms to continue in effect. In support of this argument, the appellant quotes from section 22 of the act (49 USCA § 22) as follows: "And nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

The appellant also argues that the preliminary finding of the Commission was not required, and that it was of no force and effect.

A conclusive answer to these contentions is to be found in the case of Texas & Pacific Railway Company v. Abilene Cotton Oil Company, 204 U. S. 426, 446, 447, 27 S. Ct. 350, 358, 51 L. Ed. 553, 9 Ann. Cas. 1075, where the identical argument as to section 22 was presented:

"This clause, however, cannot in reason be construed as continuing in shippers a common-law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself. The clause is concerned alone with rights recognized in or duties imposed by the act, and the manifest purpose of the provision in question was to make plain the intention that any specific remedy given by the act should be regarded as cumulative, when other appropriate common-law or statutory remedies existed for the redress of the particular grievance or wrong dealt with in the act.

"The proposition that if the statute be construed as depriving courts generally, at the instance of shippers, of the power to grant redress upon the basis that an established rate was unreasonable without previous action by the Commission great harm will result, is only an argument of inconvenience which assails the wisdom of the legislation or its efficiency, and affords no justification for so interpreting the statute as to destroy it."

To recapitulate, the operating rule was neither invalid for failure to be published as a tariff is published, nor unreasonable, prejudicial, discriminatory, or otherwise objectionable.

Accordingly, we hold that the judgment overruling the appellant's demurrer should be affirmed.

Judgment affirmed.