McHugh, J.
BACKGROUND
This is a case in which the plaintiff, Ronald Molinari, was injured seriously when he fell from a house on which he was installing a roof. The house was one of several being built in the same general vicinity. Plaintiff brought suit against three defendants: Royal Heights Construction Co., Inc. (“Royal”), the general contractor, Janice DeLoia (“DeLoia”), the construction supervisor and Royal’s president, and David P. Brennan (“Brennan”), the roofing subcontractor. Brennan was defaulted before trial. The case against the remaining defendants proceeded to trial where plaintiff recovered a sizable verdict.
The liability case against DeLoia was submitted to the jury on three special questions. Those three questions were as follows:
1. Did Defendant, Janice DeLoia, negligently
A. Fail to carry out a common-law obligation? YES NO
B. Fail to carry out an obligation imposed by regulation? YES NO
C. Select a sub-contractor? YES NO
The instructions given to the jury with respect to question 1(A) focused on whether DeLoia had sufficient “control" over the project to impose on her the common-law duty to exercise reasonable care for the safety of those working at various jobs the project involved. See generally Corsetti v. The Stone Co., 396 Mass. 1, 9-11 (1995). With respect to question 1(C), the jury was given standard instructions regarding the obligation the law imposes on one who selects an independent contractor to use reasonable care in doing so. See Restatement (Second) of Torts §411. With respect to question 1(B), the juiy was instructed that if plaintiff proved that certain regulations which will be described in more detail momentarily applied to DeLoia and if plaintiff also proved that DeLoia negligently failed to carry out duties those regulations imposed on her, then the jury could use that failure as evidence that DeLoia was negligent regardless of the “control” she in fact retained over the manner in which work on the project was carried out. The jury answered “no” to Questions 1(A) and 1(C) but answered if “yes” to question 1(B).[1]
Insofar as Royal was concerned, the jury was asked a single liability question, i.e., “(d]id Defendant, Royal *253 Heights Construction Company, negligently fail to carry out an obligation imposed by regulation?” Once again, the jury was instructed that if plaintiff proved that certain regulations which will be discussed below applied to Royal and if plaintiff proved that Royal negligently failed to carry out duties those regulations imposed, then the jury could use that failure as evidence that Royal was negligent. After deliberating, the jury answered the question “yes.”[2]
Defendants, understandably placing heavy reliance on Corsetti, claimed from the outset, as they claim now, that they could not be held liable under any theory for the injuries plaintiff suffered unless plaintiff proved that they “controlled" the work plaintiff was doing at the time the accident happened. Defendants advanced that position in various pretrial motions, in a motion for directed verdict at the close of the plaintiffs case and in a similar motion they made at the conclusion of all the evidence. They advance that position now in their present motion for judgment n.o.v.[3]
DISCUSSION
The evidence introduced at trial permitted the jury to find, as it did, that DeLoia, in addition to her status as Royal’s president, was the “construction supervisor” on the project. 780 CMR R52.15, a portion of the Massachusetts Building Code (“Code”),[4] provides, in material part, as follows:
2.15.1 Responsibility for Work: The [construction supervisor] shall be fully and completely responsible for all work for which he is supervising. He shall be responsible for seeing that all work is done pursuant to 780 CMR and the drawings as approved by the Building official.
780 CMR R52.16, also a portion of the Code, provides, again in material part, as follows:
2.16 Permit Applications: All building permit applications shall contain the name, signature and license number of the construction supervisor who is to supervise those persons engaged in construction, reconstruction, alteration, repair, removal or demolition as regulated by 780 CMR 108.3.5 and 780 CMR R5[. I]n the event that such licensee is no longer supervising said persons, the work shall immediately cease until a successor license holder is substituted on the records of the building department.[5]
Finally, insofar as DeLoia is concerned, yet another portion of the building code, 780 CMR 3006.1, provided at the time[6] as follows:
[w]henever a building or structure is erected, altered, repaired, removed or demolished, the operation shall be conducted in a safe manner and suitable protection for the general public and workers employed thereon shall be provided.
There was evidence from which a jury could have concluded that Royal subcontracted the roofing work to Brennan, that the subcontract said nothing about safely responsibilities, that Brennan permitted plaintiff to work on the roof in a manner that was not safe and that did not conform to 780 CMR.[7] There also was evidence from which a jury could have concluded that DeLoia was the “construction supervisor” on the job,[8] that she knew she was the construction supervisor but that she nevertheless did not consider herself responsible for the manner in which any of the work on the jobsite Royal had subcontracted to others was actually carried out and accordingly neither made any safety inspections of that work herself nor caused others to make such inspections.
The evidence introduced at trial also permitted the jury to find, as it did, that Royal was the “general contractor” on the project. 454 CMR 10.03, which was applicable to this project,[9] provided in pertinent part as follows at the time of the accident:
(1) Protection of health and safety of employees and others:
(a) All places where employees are directed or permitted to perform work of any kind in construction work or demolition work shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of employees and others.
(b) Employers, owners, contractors, subcontractors, superintendents or foremen in charge, and other persons obligated by law to adhere to the requirements of 454 CMR 10.00 shall not direct, or permit an employee to work under conditions which are not in compliance with or which are prohibited by 454 CMR 10.00.
(8) Safety inspections: The General Contractor and/or Subcontractor on any project included in the scope of 454 CMR 10.00 shall arrange to have daily inspections made by a designated person during the period of the project for the purpose of assuring compliance with 454 CMR 10.00.
(9) Rules of construction: A prime contractor and any subcontractors may make their own arrangements with respect to obligations which might be more appropriately treated on a jobsite basis rather than individually ... In no case shall the prime contractor be relieved of overall responsibility for compliance with the requirements of this part for all work to be performed under the contract.
As stated, there was evidence from which are jury could have concluded that plaintiff was permitted to work on a roof that was not equipped with roofing brackets and catch platforms conforming to the requirements of 454 CMR 10. 104(22). There was also evidence from which a jury could have concluded that Royal made no arrangements to have daily inspections made by a “designated person.”[10] Moreover, there was evidence that no written portion of the subcontracts Royal entered expressly re *254 quired Royal’s subcontractors to follow, and insure observation of, the safety obligations the regulations imposed on Royal and there was evidence that no Royal employees had any discussions with employees of subcontractors in which those subcontractor’s employees were instructed to ensure that the work was carried out in accordance with regulatory requirements.
In sum, there was evidence from which the jury could have concluded both that DeLoia and Royal violated regulations designed to ensure the safety of employees working on the job and that those violations were a substantial factor in producing the injuries from which plaintiff suffered. Indeed, even defendants do not here urge that the evidence at trial was insufficient to permit a reasoning jury to reach both of those conclusions.
As stated earlier, however, the juiy also concluded, on fully supportive evidence, that DeLoia did not have sufficient “control" over the work to impose on her a common-law responsibility for insuring that the work was done safely. That conclusion was perfectly consistent with DeLoia’s own testimony that she had no discussions with subcontractors regarding safety requirements, that Royal’s contracts with the subcontractors were silent regarding safety responsibilities and that DeLoia viewed the subcontractors as solely responsible for the safety requirements applicable to their portion of the work.
Against that backdrop, DeLoia and Royal argue now, as they argued earlier, that the juiy’s verdict regarding “control” disposes of any contention or claim that either had any duty to look after plaintiffs safety. In that regard, DeLoia and Royal assert that the quoted regulations do not create rights of action and cannot form the basis for, or even evidence of, liability absent “control” of the type discussed in Corsetti.[11] Countering, plaintiff contends the regulations in question do impose a duty on plaintiffs, even if common-law control is absent, and that their negligent violation of that duty is sufficient to impose liability on them.[12]
In analyzing plaintiff’s contention that defendants’ duty sprang from the cited regulations, it is important at the outset to put to one side cases such as Loffredo v. Center for Addictive Behaviors, 426 Mass. 541 (1998). There, the Supreme Judicial Court held “that a private cause of action cannot be inferred solely from an agency regulation.” Id. at 546. In Lojfredo, however, plaintiff had argued that violation of the relevant regulation, in and of itself, was a liability-triggering event. In other words, the plaintiff in Lojfredo was contending that recovery depended on his ability to prove (1) a violation of the regulation, (2) a causal nexus between that violation and resulting harm and (3) damages. Many other cases have concluded that a private right of action of the type for which plaintiff was contending in Loffredo is available only in rare circumstances. See, e.g., Dolan v. Suffolk Franklin Savings Bank, 355 Mass. 665, 668 (1969); Ellis v. Chase Communications, Inc., 63 F.2d 473, 477 (6th Cir. 1995); Jeter v. St. Regis Paper Co., 507 F.2d 973, 976-77 (5th Cir. 1975); Russell v. Bartley, 494 F.2d 334 (6th Cir. 1974). See generally Ludlow Education Ass’n v. Town of Ludlow, 31 Mass. App. Ct. 110, 118-20 (1991); Restatement (Second) of Torts §285.
Here, plaintiff does not argue that the regulations create a private right of action or that a violation of the regulations, in and of itself, produces liability. Instead, plaintiff argues that the regulations created a relationship between defendants and himself from which sprang the former’s duty to use reasonable care to look after his safety. In essence, therefore, plaintiff maintains that the regulations created essentially the same kind of duty that control would have created had control been present. A common-law action for negligence, plaintiff contends, supplies the remedy for any negligent violation of that duty. See generally Gabriel v. Borowy, 324 Mass. 231, 234 (1949) (“Where a statutory right is conferred upon a class of individuals as distinguished from the public at large but no remedy is provided by the statute for enforcement of the right, the right may be asserted by any appropriate common-law remedy that is available.”)
To talk about the presence or absence of a “duty,” of course, is to talk about conclusions one reaches after considering a variety of factors. Perhaps Dean Prosser expressed it best when he said
[a] duly, in negligence cases, may be defined as [an] obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.
[The] concept of a relative duty is not regarded as essential by the continental law, and it has been assailed as serving no useful purpose, and producing only confusion in ours. Its artificial characteristic is readily apparent; in the ordinary case, if the court should desire to find liability, it would be quite easy to find the necessary “relations” in the position of the parties toward one another, enhanced to expand in the defendants duty to the plaintiff. The statement that there is or is not a duty begs the essential question— whether the plaintiffs interests are entitled to legal protection against the defendants conduct. It is therefore not surprising to find that the problem of duty is as broad as the whole law of negligence, and that no universal test for it ever has been formulated. It is a shorthand statement of the conclusion, rather than an analysis in itself. Yet it is embedded far too firmly in our law to be discarded, and no satisfactory substitute for it, by which the defendants responsibility may be limited, has been devised. But it should be recog *255 nized that “duty” is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.
W. P. Keeton, Prosser & Keeton on the Law of Torts, 356, 357-58 (1984).
A similar approach and analysis were used by the Supreme Judicial Court in Irwin v. Ware, 392 Mass. 745, 756-57 (1984). There, on the same general subject, the Court stated as follows
A duty to act with reasonable care to prevent harm to a plaintiff which, if violated, may give rise to tort liability is based on a “special relationship” between the plaintiff and the defendant. See W. Prosser, Torts §56 (4th ed. 1971). While several different categories of such special relationships are recognized in the common law, they are based to a large extent on a uniform set of considerations. Foremost among these is whether a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so ... It has been said that such foreseeability can be based on reasonable reliance by the plaintiff, impeding other persons who might seek to render aid, statutory duties, property ownership or some other basis. As the harm which safely may be considered foreseeable to the defendant changes with the evolving expectations of a maturing society, so change the “special relationships” upon which the common law will base tort liability for the failure to take affirmative action with reasonable care.[13]
See also Davis v. Westwood Group, 420 Mass. 739, 743 (1995); Mosko v. Raytheon Co., 416 Mass. 395, 400-01 (1993); O’Sullivan v. Hemisphere Broadcasting Corp., 402 Mass. 76, 78 (1988); Monadnock Display Fireworks, Inc. v. Andover, 388 Mass. 153, 156 (1983); Schofield v. Merrill, 386 Mass. 244, 246-54 (1982).
The concept of “duty” thus is fluid enough to meet conditions that arise as society evolves and as interactions between and among various individuals become more complex. Viewed in that light, the court’s discussion of “control” in Corsetti is most appropriately viewed as a discussion of one set of circumstances that produces a common-law “duty” to use reasonable care for the safety of others on a construction site. That discussion is not properly viewed as the sole basis upon which construction-site duties can arise. Indeed, the Court’s opinions on the subject of “duty’s” fluid nature all but rule out any single source upon which construction-site duties, or duties existing anywhere else, exclusively rest. Instead, the existence or nonexistence of a “duty” turns on a wide variety of circumstances.
A conclusion that “control” is but one of a number of circumstances that produce a “duty” to use due care is consistent with the manner in which the subject of “duty” is approached in the Restatement (Second) of Torts. Section 409 states that one who employs an independent contractor is not liable for that contractor’s acts or omissions except to the extent provided in §§410-29.[14] Section 414, dealing with the employer’s retained control, was discussed in Corsetti and contains the principle on which that case turned. Section 424, however, contains an entirely separate principle to the effect that
[o]ne who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions.[15]
Section 424, in turn, expresses well established Massachusetts law. In Boucher v. New York, New Haven & Hartford Railroad Co., 196 Mass. 355 (1907), the Court was faced with a claim by an individual who had been injured when a crossing guard negligently lowered a gate at a railroad crossing. The defendant maintained that the crossing guard was an employee of an independent contractor and thus that the defendant was not liable for his acts or omissions. The Court held that the evidence was sufficient to support imposition of liability on the defendant either under a theoiy that, although the guard was the employee of an independent contractor, the defendant had retained sufficient control over his work or that the guard was the borrowed servant of the independent contractor and subject, while borrowed, to defendant’s control. But those two theories, the Court held, did not exhaust the range of possible bases for the defendant’s liability for the guard’s negligence. As the Court put it,
The view most favorable to the defendant would be that, by the arrangement with the New York Central Company, that company became an independent contractor with the defendant, and undertook to do the business of protecting the defendant’s railroad with gates, in such a way as to leave it with no right to control, direct or manage it. If that were the arrangement, the gate tender would not be the defendant’s servant. But it does not follow that the defendant would not be liable for his failure to use due care for the protection of travelers at the crossing. If the gates were maintained in obedience to an order made under the Rev. Laws, c. Ill, §192, we think it plain that [defendant] could not relieve itself from liability for negligence in the maintenance and management of them by an arrangement with an independent contractor. By the terms of the statute they are to be maintained by the [defendant’s] agent, and the [defendant] is to be responsible for *256 their proper maintenance. Even if there were no such order, and if the jury found that it was the defendant’s duty to maintain them for the protection of the public, we are of opinion that it was a duty that could not be delegated, either to a contractor or to a servant, in such a way as to relieve the [defendant] from the obligation to see that due care was exercised for the safely of travelers. It is a principle of law that, when one is conducting a business the necessary effect of which is to expose others to great danger, so that he ought to take precautions for their safety, he is responsible for the negligence of an independent contractor to whom he intrusts the performance of this duty.
Id. at 359-60. Other cases are to the same effect, albeit in a different context. See Barry v. Keeler, 322 Mass. 114, 126-27 (1947); McGinley v. Edison Electric Illuminating Co. of Boston, 248 Mass. 583, 586 (1924).
Against that backdrop, I am of the opinion that, because of the quoted regulations and the environment in which those regulations operated, a construction supervisor like DeLoia and a general contractor like Royal had a common-law obligation to use reasonable care for the safety of jobsite workers even if neither retained the kind of day-to-day control over jobsite activities discussed in Corsetti. Quite clearly, the quoted regulations imposed on DeLoia and on Royal the obligation to look after the safety of workers on the jobsite. Manifestly, those regulations were designed to impose responsibility for job safety on certain easily identifiable individuals or entities or both so that those individuals or entities either would take the action required to maintain a reasonably safe working environment or take clear, affirmative steps to delegate safety responsibility to others. Overall, the regulatory goal was, and it is, to ensure that responsibility for job safety remained in a clearly defined location and did not become obscured as responsibility for constituent parts of the overall project was parceled out.
Any reasonable construction supervisor — a highly trained and thoroughly competent individual, licensed by the state and subject to regulation by the Board of Building Regulations and Standards in the conduct of his or her work — would recognize that the regulations charged him or her with responsibility for ensuring that the work he or she had agreed to supervise was carried out in a reasonably safe fashion. Similarly, any reasonable general contractor would recognize that those regulations imposed on him or her the same ultimate responsibility for jobsite safety. Both the general contractor and the construction supervisor could reasonably anticipate that their failure to take reasonable steps to fulfill that responsibility had the potential for causing harm to jobsite workers, for no great leap of faith is required to realize that failing to carry out a responsibility others are relying on you to discharge give’s rise to the very distinct possibility that no one will do so. When the responsibility in question is maintenance of a safe working environment, it likewise is not difficult to envision the potential for physical harm to jobsite workers the absence any supervisory control mayproduce.
Notwithstanding those principles, defendants assert that the Supreme Judicial Court’s decision in St. Germaine v. Pendergast, 411 Mass. 615 (1992), prohibits use of the regulations even for the limited purpose of imposing on defendants the duties the regulations describe. While some of the language in St. Germaine supports defendants’ contention, I do not believe that the case should be read so broadly.
In St. Germaine, the defendant, a homeowner, was building a single-family home on his own property for his own use when plaintiff, an employee of a contractor, was seriously injured. Before the project began, defendant had obtained a building permit and a so-called “homeowner license exemption." The latter allowed defendant to build his home without hiring a general contractor or a licensed construction supervisor. The regulation containing the homeowner license exemption provided in material part as follows:
Any Home Owner performing work for which a building permit is required shall be exempt from the provisions of this section [requiring a licensed construction supervisor to oversee construction projects]; provided that if a Home Owner engages a person(s) for hire to do such work, that such Home Owner shall act as supervisor.
780 CMR §109.1.1.
In Count 2 of his three-count complaint, Plaintiff alleged that defendant,
by acting as his own contractor and obtaining a building permit and other documents in his own name to construct the home, voluntarily assumed the role of a [licensed] “construction supervisor” and “general contractor,” which made him responsible for any violations by [plaintiffs employer] of the State Building Code and related regulations.
Id. at 617. Early in the litigation, the trial court allowed defendant’s motion for summary judgment dismissing Count 2. That dismissal was affirmed by the Supreme Judicial Court which stated as follows:
There was also removed from the case by summary judgment for [defendant] the plaintiffs’ claim that provisions of the State Building Code allowing a homeowner an exemption from the requirement of hiring a licensed construction supervisor . . . and the terms of the homeowner license exemption received by [defendant] imposed all of the duties of such a supervisor on him, and further that, by taking out a building permit in his own name, [defendant] assumed all of the duties imposed on a general contractor under the State Building Code, *257 including the duty to provide a safe workplace. Thus, the plaintiffs argue (according to their reply brief) that “these [provisions and documents] . . . defined the scope of the duty owed by the person who assumes the role of a construction supervisor or contractor and impose on those persons a nondelegable duty to assure compliance with the State Building Code ... As such, the regulations expand on the common law duty of a homeowner to maintain property in a safe condition.
We reject, as an initial matter, the notion that any of the provisions of the Building Code and other rules and regulations relied on by the plaintiffs create a new duty making a homeowner liable for violations of the State Building Code. “We do not construe a safety statute to establish a new civil cause of action without express terms or clear legislative intent to that effect." . . . Nor do violations of a statute or regulations constitute negligence per se; they are only some evidence of negligence . . .
The various provisions of the State Building Code and other rules and regulations relied upon by the plaintiffs could be considered as evidence of negligence with regard to duties imposed by common law on [defendant], a point recognized by the trial judge and explained in his jury instructions (which we shall discuss in a moment). Those sources, however, did not create a new “nondelegable duty” to assure compliance with the State Building Code.
Language in the homeowner license exemption that the homeowner is “responsible” for compliance with the State Building Code, is to be understood in light of the additional provision in the document that the homeowner act as a “supervisor” of the construction and “agree[ ] to be present on the site at some point to approve construction . . . involving . . . Rough framing [and] Finished framing ...” This language also does not create a new “nondelegable” duty, or impose on [defendant] the role of a licensed construction supervisor. As the regulations governing a licensed construction supervisor make clear, see 780 Code Mass. Regs. §§1.1-3.5, a person holding such a license is a highly trained individual, with at least three years of experience, whose practice is regulated by the Board of Building Regulations and Standards. A homeowner building his own home under an exemption is recognized by the State Building Code as a nonexpert . . . who is involved only in periodic supervising of a less complex construction job. The terms of the homeowner license exemption constituted evidence as to whether [defendant] acted properly in monitoring his subcontractors. Similarly, the building permit did not impose on [defendant] any duties that might apply to an experienced general contractor. Summary judgment for [defendant] was proper on the plaintiffs’ claims discussed above, and the case was correctly put to the jury on theories of common law negligence.
Id. at 619-21.
Although the quoted portion of the Court’s opinion can be construed in several ways, I do not view that opinion as silently rejecting §424 of the Restatement or as silently overruling the Court’s earlier decision in Boucher. Instead, I am of the opinion that the Court was first of all stating the often expressed principle that administrative regulations do not, in of themselves, create private causes of action. Secondly, the Court was stating that the regulations it was discussing did not, by their express terms or by necessary implication, impose on homeowners the kinds of duties they imposed on highly skilled, trained and licensed construction supervisors or on general contractors. Neither basis for the Court’s statements undercuts the principle that in appropriate circumstances administrative regulations can be the source of a duty the common law requires an individual or an entity to use reasonable care in discharging. It is that role I am persuaded the cited regulations play here.
ORDER
In light of the foregoing, it is hereby ORDERED that defendants’ motion for judgment n.o.v. should be, and it hereby is, DENIED.

The jury also answered “yes” to a question which asked whether the negligence found in the answer to question 1 was a “substantial factor” in producing the injuiy plaintiff suffered and for which he had brought suit.

Likewise, the jury answered “yes” to a question which asked whether Royal’s negligence was a “substantial factor” in producing plaintiffs injuiy.

Citing Addis v. Steele, 38 Mass. App. Ct. 433, 440 (1995), DeLoia also asserts that she cannot be held individually liable because, at all times, she was acting as an agent of Royal. The theory of liability underlying the claim against DeLoia, however, focused on her own failure to take actions she allegedly was required to take, not on her personal liability for Royal’s alleged omissions. Recovery against her therefore is not affected by the principles discussed in Addis.

The Building Code is promulgated by the State Board of Building Regulations and Standards. See G.L.c. 143, §§93, 94, 96.

 780 CMR 108.3.5 and 780 CMR R5 regulate construction supervisors, not the construction, reconstruction, alteration, repair, removal or demolition they are charged with overseeing.

The designations and text of relevant portions of the 780 CMR have changed with various recodifications over the years. Effective February 28,1997, 780 CMR 33 replaced 780 CMR 30. At that point, 780 CMR 3304.1 replaced and changed what had been 780 CMR 3006.1. The latter section was in effect on the date of this accident.

To conclude that Brennan’s execution of the work did not conform to 780 CMR, the jury had to find that certain safety devices were required by 454 CMR 10.104(22) and were not in place at the time of the accident. There was substantial evidence on which the juiy could have made those findings.
*258 In addition, the court also had to conclude that 454 CMR 10.104(22) was incorporated by reference in 780 CMR on the date of the accident. I did reach that conclusion but the path to it is somewhat tortuous.
454 CMR 10.00 was a recodification of what had been known as Industrial Bulletin No. 12. Industrial Bulletin No. 12 originally was codified in the CMR as 441 CMR 10.00. In December of 1986, 441 CMR 10.00 was replaced by 454 CMR 10.00 and 441 CMR 10.00 ceased to exist. Nevertheless 780 CMR 3000.2.1 continued to refer to, and incorporate by reference, 441 CMR 10.00 until February 28, 1997, when §3000.2.1 was itself replaced.
At the time of the accident, therefore, 780 CMR 3000.2.1 provided, in pertinent part, as follows:
Other regulations: In addition, the following regulations shall also apply when not covered by this code: Rules and Regulations in Construction Operations (441 CMR 10.00)
At the time of the accident, however, 441 CMR10.00 had been replaced by 454 CMR 10.00 and no longer existed. Effective February 28, 1997, 780 CMR 3301.2 provided, and provides now, that
[njothing herein contained shall be construed to nullify any rules, regulations or statutes of state or federal agencies governing the protection of the public or workers from health or other hazards.

When not covered by the provisions of 780 CMR, 454 CMR 10.00: Construction Industry Rules and Regulations, shall apply.

Similarly, 780 CMR 100.5, as it existed on the date of the accident provided as follows:
Specialized codes, rules or regulations pertaining to building construction, reconstruction, alteration, repair, or demolition promulgated, and as amended, from time to time, by the various authorized state agencies shall be incorporated in this code. The said specialized codes, rules or regulations include, but are not limited to, those listed in Appendix G.
Appendix G, as it also existed on the date of plaintiffs accident, listed, among other things, “Accidents on Construction Operations — Rules and Regulations for — 441 CMR 10.00 Industrial Bulletin No. 12.” See now 780 CMR 101.5 and Appendix A.
Both 454 CMR 10.104(22), which was in effect on the date of the accident, and its predecessor, 441 CMR 10.04(37), which was not in effect on the date of the accident, dealt with the same topic. The provisions and requirements of those two sections, however, were different.
Under all of those circumstances, I am of the opinion that the references in 780 CMR to 441 CMR 10.00 should be read as references to 454 CMR 10.00 and its various subsections after the latter repealed the former. As a consequence, I am of the opinion that 454 CMR 10.104(22) was a regulation incorporated by reference in 780 CMR at the time plaintiffs accident occurred.

On that score, the jury could have concluded as follows: Ms. DeLoia signed the building permit application “Janice DeLoia Royal Heights Const” in the space labeled “Signature of Owner” and in the space labeled “Signature of Applicant." In the space labeled “contractor” she listed “same as above,” an apparent reference to Royal Heights, and Janice DeLoia. Next to the space labeled “contractor” was a space labeled “builder’s license no.” in which she inserted the number 047075, her construction supervisor’s license number. She then drew an arrow from her name to that number.

 454 CMR 10.00, formerly Industrial Bulletin No. 12, was promulgated by the Department of Labor & Workforce Development. See G.L.c. 149, §6. 454 CMR 10.02(3) provided as follows:
Scope. 454 CMR 10. 00 is applicable to all activities related to the erection, construction, alteration, demolition, repair or maintenance of buildings, structures, bridges, highways, roadways, dams, tunnels, sewers, underground building or structures, underground pipelines or ducts and all other construction projects or facilities.
454 CMR 10.01 defined a “building,” for purposes, inter alia of §10.02, as
[a] structure enclosed within exterior walls or fire walls, built, erected and framed of component structural parts designed for the housing, shelter, enclosure and support of individuals, animals or property of any kind.

A “designated person” is
[a] person selected and directed by an employer to perform a specific task or duty, who shall have the degree of competence necessary to accomplish the work in a safe manner.
454 CMR 10.01.

Virtually all of the cases cited and discussed in defendant’s comprehensive brief focus either on whether the defendant’s control over the work was sufficient to engender liability or on whether a private right of action exists for the violation of a regulation. None focus on the question whether a regulation can create a duty to use reasonable care to look out for the safety of others that otherwise would not exist.

Plaintiff also suggests that the court should deny defendants’ motion because DeLoia and Royal in fact did have sufficient control to trigger their liability. That suggestion is tantamount to a request for a partial judgment n.o.v. in plaintiffs favor with respect to the jury’s answer to Question 1. The evidence, however, was sufficient to support the jury’s conclusion that neither DeLoia nor Royal expressly or by implication retained control over the work plaintiff and plaintiffs employer were performing at the time the accident occurred. Indeed, there was little testimony or other evidence to the contrary. Accordingly, plaintiffs contention that DeLoia and Royal retained sufficient control is unavailing and analysis of defendants’ motion necessarily proceeds on the basis of the jury’s conclusion that control was absent.

As that passage makes plain, the concept of “special relationship,” like the concept of “duty,” is a conclusion, not an analytic tool.

“[B]ecause there are so many exceptions to this general rule, the rule itself has been described as a ‘preamble to the catalog of its exceptions.’ ” Id., comment b, quoting from Pacific Fire Ins. Co. v. Kenny Boiler & Mfg. Co., 201 Minn. 500, 503 (1937).

There is a split of authority on the question whether §424 applies to employees of independent contractors. Many of the cases are collected in Curless v. Lathrop Co., 583 N.E.2d 1367, 1377 & nn.3, 4 (Ohio App. 1989). Nothing in the text of, or comments to, §424 suggests that it does not and the only Massachusetts case to focus on the issue, albeit in dictum, strongly suggested that it does. See generally Santella v. Whynott, 27 Mass. App. Ct. 451, 454 & n.4 (1989). Moreover, the Restatement is designed to be a reflection of the common law, not a source of it. For the reasons detailed below, there are sound policy reasons for viewing §424 as the embodiment of the common law applicable to the relations between construction supervisors or general contractors and the employees of subcontractors.